762 A.2d 48

**Taurrance RICHARDSON**

v.

**Horace McGRIFF.**

**No. 142, Sept. Term, 1999.**

Court of Appeals of Maryland.

Nov. 15, 2000.

438

David F. Albright, Jr. (Horn & Bennett, P.A., on brief), Baltimore, for petitioner.

Donald R. Huskey, Associate Legal Counsel, Charles R. Gayle, Associate Legal Counsel (Thurman W. Zollicoffer, Jr., City Solicitor and William R. Phelan, Jr., Principal Counsel, on brief), Baltimore, for respondent.

H. Jeffrey Tabb, Greenbelt, for Amicus Curiae Brief of Maryland Trial Lawyers' Ass'n filed on behalf of Taurrance Richardson.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY,* RAKER, WILNER, CATHELL and HARRELL, JJ.

WILNER, Judge.

On the evening of January 12, 1996, petitioner and six of his friends broke into a vacant apartment at the Middle Branch Apartment development in Baltimore City and had a party. Someone reported the intrusion to the police, as a result of which Officers McGriff and Catterton responded. They entered the then-darkened apartment and began to search it. We shall describe the ensuing events in greater detail below, but suffice it to say here that petitioner hid in a kitchen closet, that he refused to come out when the police announced their presence and called upon him to do so, that he was holding a vacuum cleaner pipe in his hand, that it was extremely dark in the kitchen, that when Officer Catterton quickly opened the closet and Officer McGriff shined his flashlight inside, McGriff saw what appeared to him to be a man holding a large weapon and lowering it into firing position, and that, in self-defense, he fired at petitioner and severely wounded him.

---

* Rodowsky, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

Petitioner sued Officers McGriff and Catterton, the City of Baltimore, the State of Maryland, and the Police Commissioner of Baltimore in the Circuit Court for Baltimore City, alleging the violation of his rights under Articles 24 and 26 of the Maryland Declaration of Rights and several common law torts. After a winnowing both before and during trial, with which we are no longer concerned, the claims against Officer McGriff for battery, gross negligence, and violation of rights under Article 26 were submitted to the jury, which returned a verdict in the officer's favor. Petitioner appealed the judgment entered on those claims, and, in an unreported opinion, the Court of Special Appeals affirmed. We granted *certiorari* to consider whether (1) the trial court erred in precluding petitioner from introducing evidence of certain Baltimore City police regulations, guidelines, and training procedures pertaining to the use of deadly force, (2) a supplemental instruction to the jury improperly precluded the jury from considering the officer's actions prior to the opening of the closet door, (3) the court erred in denying petitioner the opportunity to examine a police sergeant concerning police training and reasonable alternatives to Officer McGriff's actions, and (4) the court erred in failing to sustain petitioner's objection, under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), to the striking of certain African Americans from the jury. Finding no error, we shall affirm the judgment of the Court of Special Appeals.

## BACKGROUND

Although the parties disagree on some of the inferences to be drawn from it, most of the evidence presented was not in dispute. We shall recite that evidence as presented and note those few instances where there was a significant dispute.

Petitioner and his friends, all of whom lived in the immediate vicinity, gathered in the apartment around 9:00 in the evening. Although petitioner claimed they entered the apartment to get warm—an objective that could have been achieved had they simply gone to their respective homes-their apparent purpose was to smoke marijuana which, according to petition-

er, all save himself proceeded to do. Petitioner was 20; the two youngest members of the group were 13. The group congregated in the kitchen. After about an hour, one of the boys noticed the police outside, and everyone panicked. After turning out the kitchen light, petitioner and three of his friends hid in a folding—door closet, petitioner taking with him a vacuum cleaner pipe with which he had been playing. During his recitation of the event, petitioner never mentioned any shots having been fired from the apartment.

McGriff stated that, about 10:00, he received a call for "several males, that's the way I heard it, in a vacant apartment, shots fired."[1] He went to the rear of the building and observed "an open, vacant apartment, which was dark and, you know, the door was ajar." He did not enter the building at that point, but instead called for "another unit with a flashlight," and waited for that unit—Officer Catterton—to arrive. McGriff explained that he and Catterton were "side partners" who often responded to calls together, backing each other up, and that they had canvassed many vacant apartments together. Catterton confirmed that he and McGriff were familiar with the apartment development and had, on a number of occasions, discovered vacant apartments there that had been broken into. Catterton said that homeless persons often broke into the vacant apartments, and that the usual procedure in investigating apparent break-ins was to enter the apartment, make certain that no one was there, and ensure that the plumbing was intact. Scrappers, he said, would come in and steal the copper pipes. If everything was in order, they would notify the management that the apartment had been broken into and keep an eye on it for a few days.

The officers first searched an upper apartment and then turned their attention to Apartment T, at the terrace level. McGriff noticed that the door was ajar and that it had signs of

---

1. McGriff admitted that the bulletin may have said "seven" males, but that he heard "several" rather than "seven." Catterton recalled the message as "a group of black male juveniles inside the vacant dwelling discharging firearms. That's exactly how the dispatcher put it to me."

forced entry. He said that, at first, he and Catterton thought this was an "average" call that was probably false, but nonetheless required investigation. Catterton said, however, that, even in the vestibule, he could smell the odor of marijuana that seemed to be coming from Apartment T, and he suggested to McGriff that that apartment be checked. Catterton added that his intent was not so much to confront armed individuals as to determine whether there were any victims. It had been his experience that "discharging calls are often followed or lead to the discovery of a victim."

McGriff said that, upon entering the apartment, he announced their presence.[2] Catterton said that the odor of marijuana grew as they entered. He also confirmed that they announced their presence. Hearing no response, they began a systematic, room-to-room search, in Catterton's words, "to ascertain if there was someone secreting themselves or a victim possibly inside of the apartment." Catterton said that, although the apartment was dark, "it wasn't so dark that you couldn't see. There was enough light to navigate by," noting that some street light entered the apartment through the windows. It was stipulated, however, that, at the time of the shooting, the kitchen was "extremely dark." Catterton explained that they did not look for light switches because, in his experience, it was better not to change the environment. The eyes, he said, become accustomed to the dark, but when lights are turned on, "you're blinded temporarily. . . . If it takes two seconds or ten seconds for your eyes to adjust, it's detrimental." At first, McGriff said, they did not even enter the kitchen, but merely "flashlighted" it.[3] Seeing nothing, they turned to leave, but then heard a "bump" come from the room.

---

**2.** Petitioner denied hearing any announcement by the police of their presence or any direction for persons in the apartment to reveal themselves. He also claimed that the apartment door was unlocked when he and his friends entered. Those two matters were in dispute.

**3.** Officer Catterton testified that the flashlight was an 18,000 candle power halogen flashlight. Officer McGriff agreed that the flashlight was powerful enough to illuminate the kitchen wall from a distance of ten feet.

Petitioner confirmed that there was some kind of "boom" before the officers entered the kitchen.

Upon hearing the "bump," McGriff and Catterton walked inside the kitchen and noted that there was no place, other than the closet, for a person to hide. McGriff obtained the flashlight from Catterton, who moved out of the line of possible fire and put his hand at the top of where the closet door folded, preparing to pull the door open. McGriff got into a position where he would be able to see into the closet when the door was opened, drew his pistol and aimed it at the center mast of the closet. He then announced: "All right. We're getting ready to open the closet. Police. Come on out." Although petitioner denied hearing any such warning, Catterton confirmed the second warning, recalling that "we again announced our presence and said, 'Come out of the closet.'" Hearing no response, Catterton pulled the closet door open, and, according to McGriff, "immediately my flashlight struck the light of the object, which I thought was a barrel of a big weapon. And all I saw was a glimmer, and what I perceived as someone coming towards me, and I fired." He continued, "[a]nd the weapon fell to the ground. I took my right foot and I slid the weapon behind me, and I just stood there covering the closet. I couldn't speak or nothing. I was just—heart stopped and everything. I was totally afraid." Catterton said that he did not know whether McGriff was the one who was shot—that he was rigid, his eyes being "as big as paper plates." McGriff added later:

"[M]y flashlight immediately silhouetted off of the pipe, and I shot. But at the time I didn't know it was a pipe. It looked, in this position, it looked like somebody was grasping a weapon, and I thought he was getting ready to lower it and fire upon me. And that's when I shot."

## CONSIDERATION OF ANTECEDENT EVENTS

The first three issues raised by petitioner may be considered together. As part of his contention that Officer McGriff acted negligently and used unnecessary, unreasonable, and excessive force, petitioner urged that McGriff was remiss in

entering the apartment late at night, in the dark, facing the prospect of seven armed men, without additional back-up, and that he was also remiss in not turning on the kitchen light before having Catterton open the closet. In support of those positions, he desired to offer into evidence certain guidelines and regulations of the Baltimore City Police Department and the testimony of Sergeant Laron Wilson, and he objected to a supplemental instruction to the jury directing it not to consider whether McGriff should have called for additional back-up or turned on the kitchen lights. The evidence was excluded and the instruction was given. We shall recite the relevant procedural background with respect to each of those matters, but they all hinge on whether it was appropriate for the jury to be allowed, essentially, to second-guess the decisions by Officers McGriff and Catterton to enter and search the apartment alone and to open the closet door without first turning on the kitchen light. The *Batson* issue, of course, is entirely separate.

 To set the stage for the discussion of the first three issues, it is important to keep in mind the context. As to each of the three claims against Officer McGriff—battery, gross negligence, and violation of rights under Article 26 of the Declaration of Rights—the common issue was whether Officer McGriff acted reasonably when the closet door was opened and he saw what he regarded as an armed man about to fire on him. There was no dispute that, by shooting petitioner, McGriff intentionally caused a harmful touching and thus a battery. His defense was self-defense—that the touching was not unlawful-which brought into issue whether the deadly force was reasonable and used only as a last resort. To prove gross negligence, petitioner was required to prove that McGriff's conduct amounted to a reckless and wanton disregard of his rights,[4] and to establish a violation of his rights under Article 26—the State counterpart of the Fourth Amend-

---

4. In light of our conclusion regarding the issue framed, we need not consider whether Officer McGriff would enjoy public official immunity even if the jury had properly found him grossly negligent.

ment-petitioner had to show that McGriff did not act with objective reasonableness, from the perspective of a reasonable officer on the scene. Clearly, by shooting petitioner, McGriff effected a "seizure" of him for purposes of Article 26.

To make the requisite showings, petitioner wanted to present to the jury and have the jury determine that (1) the entire confrontation could have been avoided if McGriff and Catterton had not entered the apartment in the first place without additional back-up, and (2) McGriff would not have mistaken the unarmed petitioner for an armed person had he turned on the kitchen light before opening the closet. The reasonableness of McGriff's conduct, he contended, had to take into account, and indeed was governed by, this antecedent conduct which, in his view, violated established police procedure. He urges that the evidence sought to be presented established the violation and that the supplemental instruction precluded the jury from considering it.

### Police Guidelines and Regulations

Officer McGriff filed a motion *in limine* to exclude "any evidence relating to any alleged violations of police procedure preceding the arrest of Plaintiff," on the grounds that (1) such evidence was not probative on the issue of whether McGriff used unreasonable force, and (2) the evidence in question consisted of police "guidelines," not commands or injunctions, and left a great deal of discretion in the officer. Essentially, the motion was based on lack of relevance. The documentary evidence sought to be excluded consisted of nine pages of single-spaced guidelines issued by the Baltimore City Police Department on the use of deadly force and 13 pages of single-spaced rules and regulations concerning a wide range of police conduct and behavior. Most of the rules and regulations, which cover the entire gamut of police conduct, from being courteous and fulfilling financial obligations, to saluting superior officers, to refraining from publicly criticizing public officials, to the circumstances when gambling, drinking, and smoking is not permitted, have no discernible relevance to any issue in the case. Even the guidelines on the use of deadly

force include standards dealing with matters wholly inapposite to this case—guidelines on shooting *at* vehicles, shooting *from* vehicles, killing dangerous animals, and chasing suspects.

The rules and regulations relating to firearms require police officers to be suitably armed when on duty and, although they place conditions on the use of firearms to prevent the escape of felons and prohibit their use to prevent the escape of misdemeanants, they expressly permit officers to use their firearms in self-defense. The guidelines dealing with deadly force that petitioner particularly stressed provide, in pertinent part, that officers may use deadly force "only as a last resort," that they "should try to avoid putting themselves in a situation where they have no option but to use deadly force," that they should "[t]ry to use other less deadly means," and that they should "[w]ait for [a] sufficient number of officers to handle situation[s] without undue force." Consistent with the rules and regulations, the guidelines expressly allow the use of firearms in self-defense and state that "[t]he attacked officer is the person who has to evaluate the potential seriousness of the attack and determine an appropriate level of response," the only caveat being that "[t]he evaluation and response must be reasonable from the perspective of a reasonable police officer similarly situated."

McGriff argued that, in the context sought to be used by petitioner, these guidelines and regulations were irrelevant and misleading. He suggested that petitioner wanted the jury to determine that McGriff had violated some of those guidelines but urged that petitioner had offered no evidence that any were, in fact, violated. In that regard, he noted that all of the guidelines cited by petitioner were discretionary "and left to the officers' determination on the scene as the events unfold." McGriff added that "if the plaintiff could come in here and ... point to a hard and fast rule where you're supposed to do A, and you're not supposed to do B, C, or D, that's one thing. But when he comes in and brings in guidelines, which give a range of things that the police officers are allowed to do ... this is not a violation of a hard and fast rule."

Noting the statement that deadly force should be used only as a last resort, petitioner urged that he be permitted to elicit from McGriff his acceptance of that proposition and "that he doesn't just go in, like a cowboy, and shoot first and ask questions later." There was, of course, *no* evidence that McGriff did any such thing. Petitioner also said that he wanted to cross-examine McGriff about the admonition to "wait for a sufficient number of officers to handle situations without undue force." At no time during the hearing, however, did petitioner suggest that he was prepared to offer any evidence (1) that additional back-up was immediately available, (2) how much back-up would have been reasonable in light of the officers' previous experience and what they had been told was the situation, (3) whether, given the prospect of there being a victim in the building, it would have been reasonable for the two officers to wait, or (4) how the situation in the kitchen would have played out any differently if additional officers had joined the search of the house. The court granted the motion on relevance grounds, noting that there were no allegations in the complaint that the suit was based on a violation of any police orders, regulations, or guidelines.

Petitioner does not really suggest otherwise. None of the actions pled, and certainly none that were submitted to the jury, were based on the violation of any orders, regulations, or guidelines. Instead, at least as the argument unfolded in this Court, petitioner was seeking to use this material only as a basis for claiming that Officers McGriff and Catterton should not have entered the apartment in the first place, without some undefined additional back-up, or, once there, they should have turned on the kitchen lights. The excluded evidence was thus relevant, if at all, only in those regards.

### Testimony by Sergeant Wilson

Sergeant Laron Wilson, Officer McGriff's immediate supervisor on the night of the event, went to the scene upon the report of the shooting. In a pre-trial deposition, he recalled that in a post-event critique that he had with various squad members, not including McGriff, he pointed out that an alter-

native would have been to secure the scene and wait for additional officers and a canine unit and that "in light of the fact that it came out as seven people inside the apartment and in light of the fact that it came out shots fired, seven against two is not very good odds." When asked about his personal experiences in similar situations, Sergeant Wilson said that "[s]ometimes I've gone forward. It depends on what the specific situation is," adding that "there's no general order that specifically covers this." He continued, in his deposition, that the only relevant general order was that dealing with the use of deadly force and that "Officer McGriff acted in accordance with the general order."

Sergeant Wilson's views first surfaced at trial during the testimony of Officer McGriff. Petitioner indicated an intent to ask McGriff on cross-examination whether he agreed with Sergeant Wilson that "odds of seven against two are not good odds." Wilson had not yet testified, and neither his deposition nor any other report of his was in evidence. The court sustained an objection on the ground of hearsay. Wilson was later called as a fact witness by McGriff. The substance of his testimony was his observation of McGriff, at the scene, as being shaken, and recounting McGriff's statement to him that McGriff thought the vacuum cleaner pipe was a shotgun and "I thought I was done." Petitioner indicated an intent to cross-examine Sergeant Wilson about the training police officers get with regard to the use of deadly force, and McGriff objected. The court sustained the objection on the dual grounds that such an examination would violate the *in limine* ruling and that it would exceed the scope of direct examination. Petitioner then asked Wilson whether McGriff's actions were reasonable. In defending against McGriff's objection, petitioner referenced Wilson's deposition testimony that seven against two is not good odds and that an alternative would have been to secure the scene and await additional units. The court sustained the objection on the ground that the inquiry exceeded the scope of direct examination.

At the conclusion of the defense case-in-chief, which ended with Sergeant Wilson's brief testimony, petitioner called Wil-

son as a rebuttal witness and offered to the court that Wilson would testify that police officers are trained to use deadly force only as a last resort and to wait for a sufficient number of officers to handle situations without undue force. He also indicated an intent to question Sergeant Wilson as to whether there were reasonable alternatives "besides entering the building that evening." The court sustained McGriff's objection on the dual grounds that the proffered testimony would violate the *in limine* ruling and was not proper rebuttal, in that it did not purport or serve to rebut any new matter introduced by the defense.

Apart from whether the *in limine* ruling was correct, which we shall consider below, these evidentiary rulings were valid on the more technical grounds relied upon by the court. Sergeant Wilson's out-of-court statement, recounted in his deposition, that two against seven is not good odds was not in evidence when petitioner sought to have McGriff confirm it through cross-examination; petitioner was indirectly offering that out-of-court statement for its truth which, under the hearsay rule, he is not permitted to do. The proposed cross-examination of Sergeant Wilson was properly disallowed because it exceeded the scope of direct examination, and that same inquiry was impermissible on rebuttal because it did not tend or purport to rebut any new matter introduced by McGriff. Those calls were within the discretion accorded to a trial court. *Smallwood v. State*, 320 Md. 300, 307, 577 A.2d 356, 359 (1990); *Huffington v. State*, 295 Md. 1, 14, 452 A.2d 1211, 1217 (1982).

### The Jury Instruction

Without objection, the trial court instructed the jury that an officer may use deadly force when the officer has reason to believe that the person is posing a significant threat of death or serious physical injury to the officer .or others and that "[t]he reasonableness or excessiveness of any force is a matter to be determined in light of all of the circumstances as they appeared to the officer at the time." The court added, again without objection, that reasonableness was to be judged on an

objective basis—"whether a reasonable police officer under the same or similar circumstances could have believed that the force used was reasonable." Those instructions essentially parroted the police guidelines particularly desired by petitioner. Without objection, the court then advised that, in making the determination of reasonableness, the jury "must look at this judgment not by way of hindsight, which is always $^{20}/_{20}$, but rather under the circumstances as they existed at that moment."

When the jury returned with a question whether, in determining the reasonableness of McGriff's actions, it was restricted "to the circumstances surrounding the instant of the shooting" or could consider "the general circumstances leading up to the shooting (*e.g. calling for back-up, lights*)" (emphasis added) the court revisited the question. At that point, counsel for petitioner urged that the jury consider "all circumstances," noting that the jury "may conclude that Officer McGriff should not have entered the apartment building in the first place in light of the fact that he and Officer Catterton were outnumbered and where the severity of the call was at issue." The court rejected that notion and iterated its determination that the jury was not to base its decision on hindsight but on "the situation that confronted the officer at that moment." It continued:

"As I said, you don't use hindsight. You don't say, well, if they called for more back-up and waited for more back-up, it might have been different. You don't say, well, if they had put on more light, it might have been different. You don't analyze it that way. You analyze it that here is the situation, that whatever the light was, the light was."

## Analysis

The principal issue underlying petitioner's complaint about the *in limine* ruling and the supplemental instruction is whether, in determining the necessity and objective reasonableness of Officer McGriff's conduct when the closet door was opened by Officer Catterton, the jury should have been permitted to consider whether the officers violated any police

guidelines or regulations in entering the apartment without additional back-up and in failing to turn on the kitchen lights. The question is thus one of permissible focus: is the jury limited to considering only the circumstances contemporaneous with the "seizure"—what immediately faced McGriff when the closet was opened—or was it entitled to consider as well the reasonableness of the officer's antecedent conduct?

The touchstone of the analysis is *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), where the Supreme Court held that an "excessive force" claim against police officers under 42 U.S.C. § 1983 is to be judged under Fourth Amendment jurisprudence, rather than under notions of substantive due process. The inquiry thus focuses on the objective reasonableness of the officer's conduct. Because, the Court held, the test of reasonableness "is not capable of precise definition or mechanical application," its proper application "requires careful attention to the facts and circumstances of each particular case." *Id.* at 396, 109 S.Ct. at 1872, 104 L.Ed.2d at 455, quoting in part from *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447, 481 (1979). In that regard, and with uncanny relevance to this case, the Court concluded that

"[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."

*Id.* at 396–97, 109 S.Ct. at 1872, 104 L.Ed.2d at 455–56.

■ That principle, announced in the context of a § 1983 claim for the violation of Federal Constitutional rights, is the appropriate one to apply as well to petitioner's claim under Article 26 of the Maryland Declaration of Rights and for the common law claims of battery and gross negligence. We have long recognized that Article 26 is *in pari materia* with the

Fourth Amendment and that decisions of the Supreme Court interpreting the Federal right are entitled to great respect in construing the State counterpart. *See Gadson v. State,* 341 Md. 1, 8 n. 3, 668 A.2d 22, 26 n. 3 (1995); *DiPino v. Davis,* 354 Md. 18, 43, 729 A.2d 354, 367–68 (1999). In any event, we have adopted essentially the same principle as a matter of State common law. In *Boyer v. State,* 323 Md. 558, 589, 594 A.2d 121, 136 (1991), we recognized that "[a] police officer's conduct should be judged not by hindsight but should be viewed in light of how a reasonably prudent officer would respond faced with the same difficult emergency situation."

 In the circumstances of this case, that jurisprudence also controls petitioner's actions for battery and gross negligence. Self-defense is a defense to the common law tort of battery. *Baltimore Transit Co. v. Faulkner,* 179 Md. 598, 600, 20 A.2d 485, 487 (1941) ("If an injury was done by a defendant in justifiable self-defense, he can neither be punished criminally nor held responsible for damages in a civil action"). It is therefore the guidepost against which petitioner's evidentiary and jury instruction claims must be examined.

The extent to which a jury, in an excessive force case, may consider events antecedent to the Constitutional seizure of the plaintiff has arisen in a number of cases, in a number of different contexts. All of the courts look to *Graham v. Connor* for guidance, but there is some disagreement on how the pronouncements in that case are to be applied. To some extent, the disagreement may be more the product of context and factual predicate than doctrinal split and thus would be consistent with the observation in *Graham* that the test of reasonableness "is not capable of precise definition or mechanical application" and "requires careful attention to the facts and circumstances of each particular case." *Graham v. Connor, supra,* 490 U.S. at 396, 109 S.Ct. at 1872, 104 L.Ed.2d at 455.

The case closest in point is *Schulz v. Long,* 44 F.3d 643 (8th Cir.1995), where the police were called by the parents of the plaintiff, a paranoid schizophrenic with a history of hospitaliza-

tions for mental health treatment, to deal with aberrant behavior by the plaintiff. When the two officers arrived at the parents' home, the plaintiff was in the basement, where he had erected a barricade. The officers stood at the landing of the basement steps and spoke with the plaintiff, attempting to convince him to go to the hospital. At some point, the plaintiff picked up and, for a while, held on to, a hatchet which, when he laid it down, the police were able to seize. That caused the plaintiff to become incensed, and he began throwing bricks at the officers. When that assault ceased, one officer attempted to get over the barricade to subdue the plaintiff, believing that the plaintiff then posed a threat to their safety. Unfortunately, the officer became entangled in the barricade. The plaintiff, in the meanwhile, obtained a double-bladed axe and began advancing on the officer, holding the axe with both hands in a cocked position. The other officer, with gun drawn, ordered the plaintiff to drop the axe, and when the plaintiff continued his advance and was within six to eight feet of the trapped officer, his partner fired.

The plaintiff sued the officers under § 1983 and complained on appeal about the granting of a motion *in limine* excluding evidence that (1) the officers, by their own actions, created the need to use force, (2) they should have responded in a different manner, such as waiting for a SWAT team, and (3) they should have used a lesser degree of force. The trial court excluded the evidence, as the court did in this case, on the ground that it was irrelevant to whether any seizure of the plaintiff was unreasonable, and the appellate court found no error. As to the evidence questioning whether the officers had, themselves, created the need for deadly force, the court, quoting from *Graham*, made clear that reasonableness must be judged from the perspective of a reasonable officer *on the scene*, rather than with 20/20 hindsight. The *Graham* Court's use of language such as "at the moment" and "split-second judgment" were "strong indicia that the reasonableness inquiry extends only to those facts known to the officer at the precise moment the officers effectuate the seizure." *Schulz, supra,* 44 F.3d at 648. Similarly, responding to the complaint

that the officers should have proceeded differently and used lesser force, the court noted that the Fourth Amendment "does not allow this type of 'Monday morning quarterback' approach because it only requires that the seizure fall within a range of objective reasonableness." *Id.* at 649. The court held:

> "The Fourth Amendment inquiry focuses not on what the most prudent course of action may have been or whether there were other alternatives available, but instead whether the seizure actually effectuated falls within a range of conduct which is objectively 'reasonable' under the Fourth Amendment. Alternative measures which 20/20 hindsight reveal to be less intrusive (or more prudent), such as waiting for a supervisor or the SWAT team, are simply not relevant to the reasonableness inquiry."

*Id.*

The U.S. Courts of Appeal for the Second, Fourth, Sixth, Seventh, Ninth, and Tenth Circuits have reached similar conclusions, as have appellate courts in South Dakota and Washington. In *Greenidge v. Ruffin,* 927 F.2d 789 (4th Cir.1991), a police officer working on the vice squad observed a woman believed by her to be a prostitute enter a car and, on further surveillance, witnessed an unlawful sex act being committed in the car. The officer opened the car door, identified herself, and ordered the passengers to place their hands in view. When neither complied, she drew her weapon and repeated the order. At that point, the male passenger reached behind the seat for a long cylindrical object, which the officer believed to be a shotgun, and she shot the man. The object was, in fact, a wooden nightstick. The passenger sued under § 1983, and, on appeal from an unfavorable judgment, complained about the exclusion of evidence that the officer's failure to employ back-up and to use a flashlight violated police procedure. As here, he urged that the excluded evidence was probative of the reasonableness inquiry as it showed that the officer recklessly created the dangerous situation.

The Fourth Circuit court read *Graham* as contradicting the plaintiff's claim that, in determining reasonableness, "the chain of events ought to be traced backward to the officer's misconduct of failing to comply with the standard police procedures for night-time prostitution arrests," concluding instead that "events which occurred before Officer Ruffin opened the car door and identified herself to the passengers are not probative of the reasonableness of Ruffin's decision to fire the shot," that those events "are not relevant and are inadmissible." *Id.* at 792. The court adopted the then-existing view of the Seventh Circuit court that liability under an objective reasonableness standard must be determined exclusively upon an examination and weighing of the information that the officer possessed immediately prior to and at the moment she fired the shot, citing *Ford v. Childers*, 855 F.2d 1271 (7th Cir.1988) and *Sherrod v. Berry*, 856 F.2d 802 (7th Cir.1988) (en banc). *See also Elliott v. Leavitt*, 99 F.3d 640 (4th Cir.1996), *cert. denied*, 521 U.S. 1120, 117 S.Ct. 2512, 138 L.Ed.2d 1015 (1997), confirming *Greenidge*.

The Court of Appeals for the Second Circuit affirmed the rejection of evidence in support of a hindsight analysis in *Salim v. Proulx*, 93 F.3d 86 (2d Cir.1996). The officer, while attempting to arrest a 14-year-old juvenile delinquent who had escaped from a training facility, was attacked by a group of the delinquent's friends and family. As the officer and the delinquent tussled on the ground, the delinquent removed the officer's weapon and was holding the barrel. Fearful that the youth would gain control of the gun, the officer fired, killing the child. Rejecting the plaintiff's complaint that the officer created the situation in which the use of deadly force became necessary by violating various police procedures, such as failing to carry a radio or call for back-up and failing to disengage when attacked by the friends and family members, the court held that the officer's actions leading up to the shooting were "irrelevant to the objective reasonableness of his conduct at the moment he decided to employ deadly force" and that the reasonableness inquiry "depends only upon the

officer's knowledge of circumstances immediately prior to and at the moment he decided to employ deadly force."

In *Scott v. Henrich,* 39 F.3d 912 (9th Cir.1994), *cert. denied,* 515 U.S. 1159, 115 S.Ct. 2612, 132 L.Ed.2d 855 (1995), officers, responding to a report of shots being fired at a motel, banged on the door of the appropriate unit and announced their presence. When the door opened, the officers saw a man holding a gun, which he pointed at them. One of the officers fired and killed the man. On appeal from a summary judgment for the officers, the plaintiff contended that, under police guidelines, the officers should not have attempted to seize the plaintiff immediately but instead should have developed a tactical plan, called for assistance, and tried to get him to surrender. The Ninth Circuit court rejected the argument and concluded that those kinds of guidelines were irrelevant.

*See also Dickerson v. McClellan,* 101 F.3d 1151, 1162 (6th Cir.1996) ("in reviewing plaintiff's excessive force claim, we limit the scope of our inquiry to the moments preceding the shooting"); *Plakas v. Drinski,* 19 F.3d 1143 (7th Cir.), *cert. denied,* 513 U.S. 820, 115 S.Ct. 81, 130 L.Ed.2d 34 (1994) (limiting the reasonableness inquiry to the moments force was used); *Cole v. Bone,* 993 F.2d 1328, 1334 (8th Cir.1993) ("the issue is whether the government official violated the Constitution or federal law, not whether he violated the policies of a state agency"); *Bella v.. Chamberlain,* 24 F.3d 1251, 1256 (10th Cir.), *cert. denied,* 513 U.S. 1109, 115 S.Ct. 898, 130 L.Ed.2d 783 (1994) ("we scrutinize only the seizure itself, not the events leading to the seizure, for reasonableness under the Fourth Amendment"); *Sevier v. City of Lawrence, Kan.,* 60 F.3d 695, 699 (10th Cir.1995) ("if the preceding events are merely negligent or if they are attenuated by time or intervening events, then they are not to be considered in an excessive force case"); *Yellowback v. City of Sioux Falls,* 600 N.W.2d 554, 559–60 (S.D.1999) (no error in excluding police manual regarding use of force and handling of mentally unstable persons to establish availability of alternative strategies); *Estate of Lee ex rel. Lee v. City of Spokane,* 101 Wash.App. 158, 2 P.3d 979, 985 (2000) (rejecting plaintiff's argument that

"excessive force may be found where police conduct *preceding* the use of force is unreasonable and, thereby, *creates* the situation requiring deadly force").

This, indeed, is the only sensible approach, especially in the circumstances of this case. The jury had before it *uncontradicted* evidence that Officers Catterton and McGriff regarded this as a routine call, much like many they had received and investigated in the past. When McGriff arrived at the scene, he did *not* enter the building alone; he called and waited for back-up. His information was that there were "several" men in the building; Catterton was told that there was "a group" of juveniles. The report that shots had been fired caused concern that there may be a victim lying helpless in the building—a concern borne out by Catterton's previous experience. This was *not*, in other words, a situation where, as now argued, they expected to confront seven armed men. There was no evidence of that in the record. The jury might, perhaps, question the immediate decision by Officer McGriff to fire his gun when the closet door was opened, but it would have been sheer hindsight speculation to find that it was unreasonable, by reason of any police guideline or regulation cited by petitioner, for the two officers to enter the building and search it.[5] On this record, the admonition in the guidelines to "[w]ait for [a] sufficient number of officers to handle situation[s] without undue force" and Sergeant Wilson's *post hoc* critique had utterly no relevance; nor, through an expansive jury instruction, could the jury be allowed to speculate that Officers McGriff and Catterton should not have entered the building. They clearly were where they had a right to be, doing what they had a right to do.

A similar circumstance exists with respect to the lights. Officer Catterton explained why they did not turn on the

---

5. At oral argument in this Court, counsel for petitioner conceded that the officers had a right to be in the building. Although that concession could be taken as negating the contention that the officers should have waited for additional back-up, we shall not decide the issue on the basis of such a concession, because the issue is one of law and is too important to be side-stepped in that manner.

lights: if they turned on the lights, they would be temporarily blinded. The jury did not have to believe that explanation, but there was no evidence to the contrary. No evidence was even offered, much less admitted, of any directive in the guidelines or regulations calling for officers to turn on the lights in that situation.

Apart from the lack of a proper evidentiary record in this case to permit the jury to consider these antecedent circumstances, we need to consider where such an approach would lead. McGriff was, in fact, in the building. The lights were not turned on. Whether either of those circumstances *in hindsight* could be regarded as negligent or imprudent, they existed and, at the crucial moment, could not be changed. At the moment Catterton opened the closet door and McGriff saw what appeared to him to be an armed man lowering his weapon to firing position, *what was he to do?* Under petitioner's approach, McGriff would have been, at that split-second moment, faced with the impossible choice of either defending himself and, in so doing, risking liability for any harm inflicted on petitioner because of past events or decisions that were then uncorrectable, or taking no defensive action and putting his life in immediate and mortal danger in order to save his pocketbook. The law cannot reasonably put officers in that situation.

The dissent relies upon *Deering v. Reich,* 183 F.3d 645 (7th Cir.), *cert. denied,* 528 U.S. 1021, 120 S.Ct. 532, 145 L.Ed.2d 412 (1999), *St. Hilaire v. City of Laconia,* 71 F.3d 20 (1st Cir.1995), *cert. denied,* 518 U.S. 1017, 116 S.Ct. 2548, 135 L.Ed.2d 1068 (1996), *Abraham v. Raso,* 183 F.3d 279 (3d Cir.1999), and, to some extent *Brower v. Inyo County,* 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989) to urge a different approach. *Brower,* in our view, is wholly inapposite. Although *Deering* comes close to supporting petitioner's position, the other cases are, to a large extent, distinguishable, but, as with *Deering,* to the extent that they differ from the approach of the other Federal and State courts, we reject them as unsound and not in keeping with the holdings and pronouncements of *Graham v. Connor.*

*Brower v. Inyo County* arose from a 20–mile high-speed police chase. In an effort to stop the fleeing vehicle (and its occupant), the police set up a most unusual and dangerous roadblock. They placed an 18–wheel truck completely across the road, behind a curve, and aimed headlights from a police cruiser in such a way as to blind the driver on his approach. The driver was killed when he crashed into the truck, and his heirs sued the county, alleging excessive force in executing a seizure. The only issue before the Supreme Court was whether there had, in fact, been a seizure—the Ninth Circuit Court of Appeals had dismissed the action on the ground that there had been no seizure—and, in addressing that issue, the Court necessarily looked to all of the circumstances of the roadblock, not just the fact that it existed. The holding was that it is "enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Id.* at 599, 109 S.Ct. at 1382, 103 L.Ed.2d at 637. Inferentially, of course, that required some inquiry into the antecedent circumstances and intent of the police in establishing the roadblock. Here, there is no dispute that petitioner was seized when shot by Officer McGriff; the question is whether the seizure was reasonable, a matter not addressed in *Brower.*[6]

In *St. Hilaire,* the decedent was killed by police officers in the execution of a search warrant. The police had reason to believe that St. Hilaire was armed and dangerous, and they devised a scheme to approach him when he left his place of work, with a uniformed officer known to St. Hilaire in the lead. The scheme went awry when St. Hilaire was able to leave the building and get into his car before the officers could approach. Instead of the uniformed officer being in the lead, an officer in plain clothes ran toward the car brandishing a gun. There was a dispute of fact whether he or any of the other officers identified themselves. As, in the court's words, St. Hilaire "looked up and saw a stranger dressed in jeans and

---

6. The *Brower* Court remanded the case for precisely that determination. *See Brower v. Inyo County,* 884 F.2d 1316 (9th Cir.1989).

a t-shirt, approach his open car passenger window, pointing a .357 magnum revolver toward him," his eyes widened and he reached for his own gun, at which point he was shot in the neck and eventually died. His widow sued under § 1983, alleging, among other things, excessive force. The trial court granted summary judgment to the defendants, which the appellate court *affirmed*.

The principal issue at the appellate level was whether the officers enjoyed immunity against the § 1983 claim. The plaintiff made two arguments: (1) that no reasonable officer could believe that the law allowed him to surprise a suspect on a dead-run, in plain clothes, with gun drawn, at close range, and without identifying himself as a police officer, when executing a warrant, and (2) that there was a genuine dispute whether the shooter, Detective Gunter, reasonably believed that he was acting in self-defense when he shot St. Hilaire. The second claim the appellate court dismissed summarily as being without merit. As to the first, the trial court had found immunity on the basis that St. Hilaire's Fourth Amendment rights did not attach until the moment of seizure, which was when he was shot, and that there was no obligation on the part of the police to avoid creating circumstances where the use of deadly force becomes necessary.

The appellate court rejected the defendants' assertion that their actions need to be examined for reasonableness only at the moment of the shooting. Following its earlier decision in *Hegarty v. Somerset County*, 53 F.3d 1367 (1st Cir.1995), the court determined that it could consider all of the surrounding circumstances. It is important to note that the "surrounding" circumstances at issue were those immediately preceding the actual shooting, not, as here, discretionary guidelines dealing generally with the use of deadly force. It is also worth noting that the court expressly rejected the notion that the police have some affirmative duty to reduce the risk of violence, observing that such a contention "creates a risk that the 'duty' is so broadly defined that it gives inadequate notice of what would violate the duty." *St. Hilaire, supra*, 71 F.3d at 27. The court ultimately concluded that the officers did not violate

any clearly established law and that "[t]he judgment Detective Gunter made in that split second was at the very least reasonable, and it is not the role of the court to second-guess the decision." *Id.* at 28.

*Abraham v. Raso* also arose from a summary judgment. Abraham, a suspected shop-lifter, was shot by Raso as he attempted to leave the mall parking lot in his car. Raso claimed that she acted in self-defense, in that, while she was standing in front of the car ordering Abraham to stop, he attempted to run over her. There was some evidence that she deliberately placed herself in front of the car; there was other evidence that she was not in front of the car at all but instead shot Abraham from the side. The trial court granted the summary judgment without regard to the self-defense claim on the ground that Raso's action was objectively reasonable because, in attempting to flee, Abraham posed an immediate threat of physical harm to the public. The appellate court determined that there were genuine disputes of material fact bearing on whether Abraham posed such a threat, and, in the course of that analysis, concluded that it could not limit its examination to the very moment when Abraham was struck by the bullet and thus seized. Rather, it held that "all of the events transpiring during the officers' pursuit of Abraham can be considered in evaluating the reasonableness of Raso's shooting." *Abraham v. Raso,* 183 F.3d at 292. The court noted, however:

"We are not saying, of course, that all preceding events are equally important, or even of any importance. Some events may have too attenuated a connection to the officer's use of force. But what makes these prior events of no consequence are ordinary ideas of causation, not doctrine about when the seizure occurred."

*Id.* As in *St. Hilaire,* the circumstances at issue were contemporaneous with the seizure.

In *Deering,* the victim, an elderly man with some history of emotional problems, backed his vehicle into a motorcycle, tipping the cycle. The damage was minor and the cycle owner

offered to settle for the cost of the gasoline that leaked from the cycle, but Deering refused and so was charged with misdemeanor property damage. When he failed to appear in court for his initial appearance, a bench warrant was issued. Later that night, three armed deputy sheriffs wearing bullet-proof vests drove to Deering's farmhouse, which was in a rural area in a different county, stealthily approached it, peered inside and saw that Deering was sleeping, and knocked on the door. When Deering awoke and asked who was there, the sheriffs identified themselves. Deering then picked up his shotgun, went into the yard, and fired at one of the officers. After ordering Deering to put the gun down, another sheriff fired 11 shots at him, killing him. Deering's personal representative sued the sheriffs under § 1983. The actions against two of the officers were dismissed; the jury found in favor of the third, and the Seventh Circuit Court of Appeals *affirmed.*

The broad issue considered by the appellate court was whether the jury could consider "the totality of the circumstances" in determining whether the sheriff's actions were reasonable, and the court held that the jury not only could, but effectively did, consider those circumstances. The more precise issue was "what circumstances" the jury could consider— whether they extended beyond the precise moment when Deering fired his weapon and would include "the fact that the deputies decided to serve the warrant in the middle of the night on an elderly man living alone in a rural farmhouse." *Deering, supra,* 183 F.3d at 650. The case law, the court noted, including some of its own,[7] pointed to the fact that what was relevant was what the deputy knew *at the time* about Deering, including the warrant, the crime allegedly committed by Deering, and the deputy's perception of danger. The jury had heard evidence about the incident with the motorcycle ("which would allow them to understand that the deputies

---

7. *See Carter v. Buscher,* 973 F.2d 1328 (7th Cir.1992); *Jaffee v. Redmond,* 51 F.3d 1346 (7th Cir.1995), *aff'd on other grounds,* 518 U.S. 1, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996); *Tom v. Voida,* 963 F.2d 952 (7th Cir.1992); Plakas v. Drinski, 19 F.3d 1143 (7th Cir.1994), *cert. denied,* 513 U.S. 820, 115 S.Ct. 81, 130 L.Ed.2d 34 (1994).

were not looking for a serial murderer when they went to the farmhouse"), about how the deputies approached the farmhouse, how dark it was, and about Deering's response. They were, in the court's view, "allowed to hear sufficient information about the situation" and "had a sufficient basis on which to evaluate Reich's response to Deering's firing the shot." *Id.* at 652. It is of particular interest that the court found no error in the jury instructions, including an instruction that the deputies "did not need to use 'all feasible alternatives' to avoid the situation which developed." *Id.* The appellate court, quoting from one of its earlier decisions, *Plakas v. Drinski, supra,* 19 F.3d 1143, 1148, iterated that "[t]here is no precedent in this Circuit (or any other) which says that the Constitution requires law enforcement officers to use all feasible alternatives to avoid a situation where deadly force can justifiably be used." *Id.* at 652–53.

*Deering* did hold that the officer's knowledge of antecedent circumstances was relevant in determining the reasonableness of his actions. The dissent seizes upon a single statement by the *Deering* court that "[t]he totality of the circumstances cannot be limited to the precise moment when Deering discharged his weapon." *Id.* at 649. That statement needs to be read in context, however. The point that the court was making was that "what Deputy Reich knew at the time—about Deering, his crime, and the warrant, and his perception of the danger he and the other deputies were in—was relevant to the evaluation of the reasonableness of his conduct." *Id.* at 652. Read in that context, the determination that the totality of the circumstances must take account of the full knowledge possessed by the officers is not remarkable, and it certainly cannot be taken as a broad authority for plaintiffs to invite $^{20}\!/_{\!20}$ hindsight second-guessing. The antecedent events at issue in *Deering* were the circumstances that led the sheriffs to confront Deering—not some police guidelines dealing in general fashion with avoiding the need for deadly force whenever possible. As in *Deering,* there was no transgression of the underlying principle here. The jury was informed of all relevant antecedent events leading up to the shooting—how

the officers came to be there and what they did upon entering the building. What the jury was not allowed to do was second-guess, in hindsight, the officers' decision to enter and search the apartment without additional back-up and without turning on the kitchen light.

For these reasons, we hold that the trial court did not err in excluding the evidence subject to the *in limine* ruling, in excluding the evidence sought to be extracted from Sergeant Wilson, or in giving the supplemental instruction.

## THE BATSON ISSUE

Jury selection commenced on the morning of Friday, May 1, 1998 and was concluded that afternoon, after a lunch break. The voir dire and selection proceeding were not recorded. The transcript records only the following:

## "AFTERNOON SESSION

(Prospective jurors present in courtroom upon resuming)

THE COURT: Good afternoon, ladies and gentlemen.

THE JURORS: Good afternoon, Your Honor.

(Voir dire examination of the prospective jurors continued).

THE COURT: Madam Clerk, you may swear the jury in at this time, please.

(A jury was selected, sworn and duly impaneled)."

At that point, the court excused those prospective jurors not selected and called counsel to the bench, where an unrecorded conference ensued. Following that conference, the court excused the jurors until Monday morning. After the jurors left, the court recounted that, at the unrecorded bench conference, counsel for petitioner "indicated that he wanted to raise a *Batson* challenge at this time." The court then heard petitioner's objection to the striking by McGriff of five African–American jurors. The court found from the mere striking of those jurors, leaving a jury with one African–American and five non-African-American jurors, that petitioner had present-

ed a prima facie showing "that would require defense counsel to justify each of their strikes." Defense counsel then proceeded to give a facially race-neutral reason for each of those strikes, following which the court found that McGriff had a valid basis for each of the five peremptory challenges under review.

■ Petitioner complains that the court erred in sustaining the peremptory challenges. The problem is that he waited too long to register his objection. In *Stanley v. State*, 313 Md. 50, 69, 542 A.2d 1267, 1276 (1988), we concluded that "[a] *Batson* objection is timely if the defendant makes it no later than when the last juror has been seated and before the jury has been sworn." Requiring such an objection to be made before the jury is sworn is permissible. See *Ford v. Georgia*, 498 U.S. 411, 422, 423, 111 S.Ct. 850, 857, 112 L.Ed.2d 935, 948–49 (1991), declaring the requirement that any *Batson* claim be raised before the administration of the oath to the jurors to be "a sensible rule" and holding that "a state court may adopt a general rule that a *Batson* claim is untimely if it is raised for the first time ·... after the jury is sworn." The Federal courts have consistently held that a *Batson* objection is waived if not made during the voir dire process, and some have specified that the objection must be made before the venire is excused. *See Morning v. Zapata Protein (USA), Inc.*, 128 F.3d 213, 215–16 (4th Cir.1997) (upholding the trial court's dismissal of appellant's *Batson* challenge because appellant raised the challenge after the venire was excused); *U.S. v. Maseratti*, 1 F.3d 330, 335 (5th Cir.1993) ("To be timely, the *Batson* objection must be made before the venire is dismissed and before the trial commences"); *U.S. v. Parham*, 16 F.3d 844, 847 (8th Cir.1994) ("[A] *Batson* objection must be made at the latest before the venire is dismissed and before the trial commences"); *Government of Virgin Islands v. Forte*, 806 F.2d 73, 75–76 (3d Cir.1986) (holding that, because the defendant failed to make any objection at the close of voir dire, he "waived" his *Batson* claim); *see also Dias v. Sky Chefs, Inc.*, 948 F.2d 532, 534 (9th Cir.1991) ("*Batson* objections must occur as soon as possible, preferably before the jury is

sworn"); *U.S. v. Chandler,* 996 F.2d 1073, 1102 (11th Cir.1993) (noting that "[a]n objection is timely if it is made during voir dire").

Because petitioner's *Batson* claim was not made timely, it has been waived.

JUDGMENT AFFIRMED, WITH COSTS.

ELDRIDGE and HARRELL, JJ., concur in part and dissent in part; BELL, C.J., dissents.

HARRELL, Judge, concurring and dissenting.

I respectfully dissent in part and concur in part with the majority opinion in this case. Judge Eldridge joins in this opinion and Chief Judge Bell joins in all save Part III, D.

## I.

I first note a few points regarding the majority's recitation of the material facts adduced at trial. Despite Officer McGriff's testimony offered during his defense, as to what he recalled hearing in the police dispatcher's bulletin that sent him to the apartment building in the first instance,[1] he acknowledged earlier in the trial, as an *adverse witness during the Petitioner's case-in-chief* and without qualification, that he had responded "to a call of seven males in a vacant apartment, shots fired." He followed that acknowledgment with:

> [Petitioner's Counsel]: So, in response to the report of shots fired by seven males in a dark apartment building on a dark evening, you and Officer Catterton went in alone to confront these seven individuals. Is that correct?
>
> [Officer McGriff]: That is correct.
>
> [Petitioner's Counsel]: And you and Officer Catterton had only one flashlight between the two of you, correct?
>
> [Officer McGriff]: Yes.

---

1. "McGriff admitted that the bulletin may have 'seven' males, but that heard 'several' rather than 'seven'." Maj. op. at 442, n. 1.

Upon confronting the closed kitchen closet door, Officer McGriff, again while testifying as an adverse witness during Petitioner's case-in-chief, acknowledged that the leveling of his weapon and aiming at "center mast" was how he was "trained at the Police Academy." He elaborated that the training referred to was: "[i]n the use of deadly force. I didn't know at the time I was going to be using deadly force. I was in a ready position, as we were trained, to be in a ready position." Called upon to estimate how much time passed between Officer Catterton opening the closet door and the firing of his weapon into Petitioner's abdomen,[2] Officer McGriff stated "[a]nywhere from three to six seconds."

Petitioner testified during his case-in-chief that he did not have the vacuum cleaner tube in his hands at any time that he was hiding in the kitchen closet with his friends. After he was shot, Petitioner recalled that someone, presumably who had not been hiding in the closet, turned on the kitchen lights.

Petitioner sought to introduce, as evidence of Respondent's lack of reasonableness in shooting Petitioner, the written guidelines regarding the police use of deadly force, as delineated in a Baltimore Police Department Training Bulletin (Vol.20, No. 1) issued by the Police Commissioner on 2 May 1995. Although there was much in the Bulletin that had no facial relevance to Petitioner's claims, the following points are not so easily dismissed:

II. General Rules for Using Deadly Force

 A. Officers must use deadly force only as a last resort.

 1. Officers should try to avoid putting themselves in a situation where they have no option but to use deadly force.

 2. Try to use other less deadly means:

* * *

---

**2.** Petitioner was hospitalized twenty-eight days due to the wound inflicted.

d. Talk to suspects in a manner consistent with training which will convince them to comply with orders.[3]

\*　　\*　　\*

III. Confronting a Suspect

A. If officers have a reasonable belief that there is a threat of death or serious injury to themselves or others, they may draw their weapons.

B. Officers should keep their fingers off the trigger and below the trigger guard *until they are prepared to shoot and the threat to their lives or the lives of someone else is IMMEDIATE and the potential for serious injury or death is IMMINENT.*

\*　　\*　　\*

IV. . . .

\*　　\*　　\*

D. Members of this department shall not use firearms in the discharge of their duty, except in the following cases:

1. In self-defense, or to defend another person (unlawfully attacked) from death or serious injury.[ ]

a. The attacked officer is the person who has to evaluate the potential seriousness of the attack and determine an appropriate level of response.

b. The evaluation and response must be reasonable from the perspective of a reasonable police officer similarly situated.

c. There is no requirement that an actual, specific injury be inflicted. It is, however, required that the potential for such injury be present and the threat must be immediate.

d. When police officers have done everything they reasonably can to avoid using deadly force and believe

---

3. As the majority opinion notes, at 444, Petitioner testified that he heard no verbal commands given by the officers at any time before he was shot.

the use of deadly force is the only way to prevent serious injury to themselves or someone else, deadly force is justified.

2. [ ]To effect the arrest or to prevent the escape, when other means are insufficient, or a person whom the officer has probable cause to believe:

Has committed a felony involving the use or threat of deadly force or serious physical injury; *and*

Who poses an *imminent* threat of death or serious physical injury to the officer or others.[ ]

a. When other means are insufficient can include but is not limited to:

(1) Using the radio to direct other units to prevent suspect's escape;

(2) *Knowing* the suspect's identity *and* that he/she poses no imminent threat to anyone in the immediate vicinity of the area of escape;

(3) Challenging the suspect to halt;

(4) Pursuing suspects until it becomes obvious that capturing them is unlikely and/or further pursuit is likely to endanger the officer or others.

b. The probable cause standard allows officers to act in situations without having absolute knowledge that a violent felony has occurred but requires that their actions be based on more than mere suspicion.

c. Both the element of the officer's probable cause to believe a dangerous felony has been committed *and* the element that the offender poses an imminent threat to the officer or others in the immediate vicinity of the crime must be present before an officer can use deadly force to arrest the offender or prevent his escape.

(1) Using deadly force to stop an escaping suspect must be based on a specific threat of imminent danger

and not on a general threat to the community because of the viciousness of the crime.

\* \* \*

[ ]NOTE: Where feasible, the officer should give verbal warning prior to shooting at the felon. There are, however, situations when the issuance of a warning would be detrimental to the safety of the officers or others. In such a case, the officer need not give warning if to do so would increase the risk to himself or others.

(Emphasis in original).

Anticipating that Petitioner would attempt to offer such evidence at trial, Respondent filed a pre-trial motion in limine seeking to prohibit Petitioner from introducing evidence of any alleged violations of police procedure. Respondent's written motion, although specifically alluding to the 2 May 1995 Training Bulletin and "the Rules and Regulations published June 24, 1988," did not limit its request for relief only to those items. In granting the motion, the trial judge reasoned:

I have reviewed again the complaint, and I don't see any allegations in the complaint that this suit is based upon a violation of police orders, police regulations, police guidelines, and that as a result of the defendants' failing to observe and follow police orders, rules, regulations, guidelines, whatever they may be, the defendant (sic) had been harmed. I don't see that at all in the complaint.

In fact, the final paragraph of the complaint, Paragraph 23, says this:

\* \* \*

"At all times relevant hereto, the actions of defendants in (a) brutally assaulting Richardson, (b) filing false criminal charges against Richardson, and (c) subjecting Richardson to humiliation on the face of a lack of probable cause were all performed by defendants without warrant or justification, without probable cause and were negligent, wanton, malicious and reckless."

These are the reasons given for the wrongful acts of the defendants, that they acted in this manner. There is not a single count in the complaint labeled violation of police orders, regulations, guidelines, et cetera.

I think what this comes to is, as I think has been acknowledged by counsel, an effort to prove that the acts of the defendants were wrongful simply because they didn't comply with certain orders. And that there is no emphasis in the case, from what I read the complaint as being, that by reason of the failure of the defendants to follow rule this, rule that, order this, order that, it caused harm to the defendant.

I think to try to bring it in, in the manner that the plaintiff proposes, would be, first of all, causing a trial within a trial, and that we would get very bogged down into the whole history import of these orders and regulations. And then we get into guidelines, and plaintiff's counsel is suggesting that guidelines don't give any discretion because they use the words "shall" and "must." And, you know, are guidelines, guidelines as the word implies or does it mean nothing when it says guidelines because the words "shall" and "must" be used certain times. And we get into those semantics, and the importance and significance of those semantics.

It is somewhat akin, it seems to me, that the plaintiff is seeking to have this be a res ipsa loquitur type of situation, that the jury be told, ladies and gentlemen, this is an order from the Police Department; this is a regulation, and if you find that the defendants did not file a report, and write a report exactly when and where they were supposed to, that proves their guilt. That proves that they were negligent, that they were, you know, whatever the various counts may be, and the jury be told, failure to obey regulations or orders imposes liability on the defendants, and I don't think that's so.

I think further to bring this into the case, could very easily tend to confuse the jury and obfuscate the real issues

that have been raised by the plaintiff, and it is for these reasons that I grant the motion.

As the majority also notes (Maj. op. at 448–50), Petitioner sought to adduce testimony from Officer McGriff's and Officer Catterton's immediate supervisor, Sergeant Laron Wilson. After unsuccessfully attempting to elicit the desired information in cross-examination of Sergeant Wilson when he testified for the defense,[4] Petitioner later called Sergeant Wilson as a rebuttal witness. In order to appreciate the full backdrop against which Sergeant Wilson was called in rebuttal, one needs to appreciate also Petitioner's earlier efforts at cross-examination of Officer McGriff when he testified during the defense case-in-chief. Prior to that cross-examination, counsel for the parties approached the bench. Petitioner's counsel informed the trial judge that he intended to ask Respondent three questions. First, he would ask respondent "if he believed his actions were reasonable on the night of January 12, 1996." Second, he would ask if a reasonable "[a]lternative would have been to secure the scene and wait for additional officers to arrive." Third, Petitioner's counsel would ask "[w]ould you agree with your superior, Sergeant Wilson, that odds of seven against two are not good odds[?]"

The trial judge permitted Petitioner to ask the first two questions because they addressed the issue of reasonableness, but not the third. The court reasoned:

> The Court: I see no objection to any of the questions except the one about Sergeant Wilson. Because it seems to me that's hearsay. You don't have Sergeant Wilson in evidence here. He hasn't testified. You don't have any report of Sergeant Wilson that's in evidence. So, it just seems to me that's hearsay, and that nobody was here to say that this was what Sergeant Wilson had to say. Is that not true?

---

4. As explained by the majority, at 450–51, the trial judge's evidentiary ruling at this point in the trial was correct for at least one of the reasons given, i.e., the questions went beyond the scope of Respondent's direct examination of Sgt. Wilson.

[Petitioner's Counsel]: That's true. Sergeant Wilson will be testifying.

The Court: He will be?

[Petitioner's Counsel]: He will be.

The Court: Well, I don't—well, who's calling him?

[Petitioner's Counsel]: I was going to call him, but [Respondent's counsel] indicated that she was going to be calling him. So, I am going to examine him on those points.

[Respondent's Counsel]: I will, I do intend at this point to call him, but the point is, it's not in evidence now.

The Court: The point is what?

[Respondent's Counsel]: The point is that there's no evidence of that now.

The Court: Yes.

[Respondent's Counsel]: He's going to be referring to something that no one has talked about.

The Court: I can not allow that question, because we have nothing in evidence now to allow that question to be asked. And although Sergeant Wilson may be called, I don't know what he's going to say, and maybe what the defense would like him to say, he's not going to be able to say. There may be objections or things of that nature. So, I don't think that I can allow that question but that's the only one that I find fault with, because I don't think it violates the ruling I made with respect to the motion in limine because the heart and soul of this is reasonableness. And I think the questions really address reasonableness.

The ensuing cross-examination of Officer McGriff by Petitioner's counsel proceeded thusly:

[Petitioner's Counsel]: Officer McGriff, you indicated that when you responded to the call, you thought it was an average call.

[Officer McGriff]: Yes.

[Petitioner's Counsel]: You also indicated that you had received a report of several males; shots fired. Is that correct?

[Officer McGriff]: Yes.

[Petitioner's Counsel]: Actually, wasn't the report that you received was, seven males, shots fired?

[Officer McGriff]: I'm not disputing that. I'm just saying what I recall.

[Petitioner's Counsel]: Okay. And you considered that to be an average call?

[Officer McGriff]: Yes.

[Petitioner's Counsel]: Did you believe your actions were reasonable on the night of January 12, 1996?

[Officer McGriff]: Yes.

[Petitioner's Counsel]: Did you have any other reasonable alternative besides entering the apartment building that evening?

[Officer McGriff]: No.

[Petitioner's Counsel]: Would a reasonable alternative have been to secure the scene and wait for additional officers to arrive?

[Officer McGriff]: No.

[Petitioner's Counsel]: Even with the report of seven males, shots fired?

[Officer McGriff]: Yes.

[Petitioner's Counsel]: You testified that when you entered the apartment, you reasonably assumed that there were light switches, correct?

[Officer McGriff]: Light switches, actual switches that you flip up, yeah.

[Petitioner's Counsel]: Okay. Did you or Officer Catterton at any time activate any of those light switches?

[Officer McGriff]: No, we didn't.

When Petitioner ultimately called Sergeant Wilson as a rebuttal witness, the trial court, in the face of Respondent's objection, refused to permit Sergeant Wilson to respond to questions regarding police training and the identification of reasonable alternatives Respondent might have taken. One of the grounds relied on by the trial judge for this restriction was

that Petitioner's proffer of what Sergeant Wilson would say was not proper rebuttal evidence because the testimony would be unresponsive to, and beyond the scope of, any matter presented by the defense in its case-in-chief.[5] The basis for this aspect of the Court's ruling seems to be that, although the Respondent had been permitted to answer Petitioner's questions on cross-examination during the defense case-in-chief as to whether he thought he had any reasonable alternatives, defense counsel had not initiated that line of inquiry in her direct examination of Respondent.[6]

At the close of trial, the judge instructed the jury on three counts-battery, gross negligence, and violation of Petitioner's constitutional rights under Article 26 of the Maryland Constitution. The instructions, in pertinent part, were as follows:

With respect to battery, ladies and gentlemen, under our law a battery is the intentional touching of a person without that person's consent. Touching includes the intentional putting into motion of anything which touches another person or touches something that is connected with or in contact with another person.

---

5. The other ground was that the proffered testimony would violate the court's ruling on the motion in limine. The majority is to be commended, at the least, for not sweeping the important issues raised by Petitioner under the rug of the purely technical evidentiary bases for the trial court's rulings. *See also,* n. 7 infra.

6. As to rebuttal evidence, this Court has explained that:
 [r]ebuttal evidence 'includes any competent evidence which explains, or is a direct reply to, or a contradiction of, any new matter that has been brought into the case by the defense.' Our cases are clear that the question of what constitutes rebuttal testimony rests within the sound discretion of the trial court, and that the court's ruling should be reversed only where shown to be both 'manifestly wrong and substantially injurious.' Even if the trial court clearly rules that certain testimony is not rebuttal evidence, the court may nonetheless exercise its discretion to vary the order of proof and admit it as part of the case in chief at the rebuttal stage in order to meet the requirements of a particular case, so long as this action does not impair the ability of the defendant to answer and otherwise receive a fair trial.
 *Huffington v. State,* 295 Md. 1, 14, 452 A.2d 1211, 1217 (1982) (citing *State v. Hepple,* 279 Md. 265, 270–72, 368 A.2d 445, 448–49 (1977)).

In order to be a battery, the touching must be harmful or offensive. A touching is harmful if it causes physical pain, injury or illness. A touch is offensive if it offends the other person's reasonable sense of personal dignity.

In this case, ladies and gentlemen, the defendant has the burden of proof by a preponderance of the evidence that he was justified in committing a battery on the plaintiff.

With respect to the count of gross negligence, a person is liable for gross negligence when that person acts with wanton or reckless disregard for human rights or the rights of others. Police officers are not immune from liability for gross negligence. And I emphasize that is the gross negligence is the count and, again, I say to you that gross negligence is when one acts with wanton or reckless disregard for the rights of others or the individual involved.

In this case, ladies and gentlemen, because the defendants were acting in their capacity as law enforcement officers, they are entitled under the law to certain protections against civil liability to enable them to do their jobs properly. This protection insulates them from liability unless you find that they acted maliciously.

Now, I say they. There's one defendant remaining now, so the they should be he. If I used they, now it is just the one defendant, he.

Therefore, before you can consider any award for the actions of the defendants, you must find as a fact that his actions were malicious. To prove malice, the plaintiff must make a factual showing that the defendant acted without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to willfully injure the plaintiff.

Even if you find that the defendant officer was over zealous, you must still find in favor of the defendant officer unless you further find that such actions were done out of malice as I have defined it for you.

If you do not find that the officer acted in this manner, then you must return a verdict for the defendant officer. If

you do find that the officer acted in this manner, then you must consider the other elements of the wrong with which he is charged; the wrong in this case was negligence.

With respect to the plaintiff's claim, the count of violation of the plaintiff's constitutional rights, the particular provision of the Constitution that the plaintiff is claiming a violation of and that his rights were violated is Article 26 of the Constitution. And Article 26 of the Constitution says this. And as I say, I'm talking about the Constitution of the State of Maryland. You can have violations of Federal constitutional rights, violations of State constitutional rights or both. It's just this one provision that's involved in this case.

Article 26 says this: That all warrants without oath or affirmation to search suspected places or to seize any person or property are grievous and oppressive, and all general warrants to search suspected places or to apprehend suspected persons without naming or describing the place or the person in special are illegal and ought not to be granted.

Article 26 of the Maryland Constitution protects individuals from warrantless seizures.

Police officers have no immunity for violation of the Maryland State Constitution. A plaintiff may recover compensatory damages for violation of the State Constitution regardless of the presence or absence of malice.

Article 26 of the Maryland Constitution protects Maryland residents from unreasonable searches and seizures in the same manner as the Fourth Amendment of the United States Constitution.

When a police officer shoots an individual, he has seized the individual. Whether the shooting is reasonable under the Maryland Declaration of Rights depends upon the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

I would also advise you, ladies and gentlemen, that under our law an officer may use deadly force when he has reason to believe that the plaintiff was posing a significant threat of death or serious physical injury to the officer or others.

In determining whether the force used by any of the police officers was excessive, I would instruct you, ladies and gentlemen, that police officers in the performance of their duties are entitled to use such force as is reasonable and necessary in order to accomplish their lawful purpose. The reasonableness or excessiveness of any force is a matter to be determined in light of all of the circumstances as they appeared to the officer at that time.

I would further advise you, ladies and gentlemen, that in determining whether force was excessive or not, you must judge it upon an objective basis. That is, whether a reasonable police officer under the same or similar circumstances could have believed that the force used was reasonable. And I would point out to you, ladies and gentlemen, that you must look at this judgment not by way of hindsight, which is always 20/20, but rather under the circumstances as they existed at that moment.

No pertinent exceptions to these instructions were taken.

During jury deliberations, the trial judge received a note from the jury asking whether "[i]n determining the reasonableness of the defendant's actions, do we restrict our consideration to the circumstances surrounding the instant of the shooting, or should we also consider the general circumstances leading up to the shooting (e.g. calling for back-up, lights)?" In addition to reiterating his earlier instructions, the trial judge further responded:

To be very specific, if I may, about your question, and your question, really, I think is directed at one point, are there surrounding circumstances. Do you consider the matter of calling for a back-up, which occurred outside the house before the officers went in. Do you consider what lights they did or did not turn on, what lights they used or

did not use. And my answer to that is, you do not consider those particular factors that you have enumerated.

You look at the circumstances as they existed at the moment the force was used, which means in the posture of this case when Officer Catterton, now Detective and then Officer Catterton, opened the closet door and what the circumstances were at that time, as you found them to be when that door was opened, because that is when the excessive force was used. Those were the circumstances that were present.

As I said, you don't use hindsight. You don't say, well, if they called for more back-up and waited for more back-up, it might have been different. You don't say, well, if they had put on more light, it might have been different. You don't analyze it in that way. You analyze it that here is the situation, that whatever the light was, the light was. And you are not to second guess the officers with respect whether they should have put on more light or less light; they should have called for more back-up; they shouldn't have gone in the house until they got more back-up, but rather here they are in that situation, and when that door was opened to the closet, those were the circumstances and that is when excessive force was used. And that is what you are to consider.

The trial judge then summarized that his clarification applied both to the battery count and to the count relating to violation of Article 26 of the Declaration of Rights. Petitioner excepted to the aforesaid limiting instruction. The jury ultimately found that Respondent was not liable on any of the counts.

Petitioner appealed to the Court of Special Appeals arguing that the trial court erred by not admitting the police guidelines regarding the use of deadly force, not allowing Sergeant Wilson to testify that Respondent had reasonable alternatives to his conduct after he responded to the police call of reported shootings, not allowing Petitioner's counsel to examine Respondent on the issue of whether the odds of "two [against]

seven" are "not good" odds, and, giving the limiting instructions that the jury could not consider any surrounding circumstances prior to the actual shooting when deciding Respondent's liability for battery or violating Petitioner's civil rights under Article 26 of the Maryland Declaration of Rights. The intermediate appellate court, in an unreported opinion by a divided panel, affirmed the trial court's judgments. The dissent in the Court of Special Appeals reasoned that the police guidelines had been excluded erroneously.

Petitioner sought review by this Court and we granted certiorari. For clarity's sake, 1 shall first address my views on whether the trial court's jury supplemental instructions, to which Petitioner excepted, were erroneous. My discussion of the issues presented by the jury instructions will provide, in large part, the legal background for my view whether the police guidelines were excluded erroneously.

## II.

### A.

Petitioner argues that the supplemental jury instructions given by the trial court in response to the jury note were too limiting in light of the totality of the circumstances test enunciated in *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). He asserts:

What *Graham v. Connor* holds is that a claim against an officer based upon a violation of the Fourth Amendment is analyzed under an "objective reasonableness" standard. The reasonableness of a particular use of force is judged from the perspective of a *reasonable officer on the scene.* No window of time is circumscribed in the Supreme Court's decision; to the contrary, the Court's statement that the reasonableness of the force used must be judged from the perspective of a reasonable police officer *on the scene* implies that all facts known to the officer *on the scene,* whenever gathered, are probative to the analysis. The Supreme Court does *not* state that the reasonableness of

the use of force must be judged from the perspective of a reasonable officer on the scene at the time the force is used. (Emphasis in original).

He further argues that by instructing the jury that they may consider only what happened from the moment that Respondent's partner opened the kitchen door, the jury was not permitted to consider reasonable and foreseeable alternatives that Respondent could have taken to avoid shooting Petitioner. Specifically, the trial court prohibited the jury from considering whether Respondent should have turned on the lights in the apartment kitchen before the closet door was opened to enable him to better see whether Petitioner was holding a gun or other weapon and whether Respondent should have waited for additional police back-up before entering the apartment.[7]

Respondent and the majority of the Court reason that *Graham* and certain U.S. courts of appeal limit the time frame of events that may be considered to determine whether the force employed was reasonable to the moment the force was used. As that position goes, the pre-seizure events leading to the use of deadly force are irrelevant to an excessive force claim analysis under the Fourth Amendment and, therefore, under Article 26 of the Maryland Declaration of Rights.[8] Respondent and the majority further assert that a non-restrictive application of the totality of the circumstances would translate into a mental distraction, with potentially adverse consequences, when a police officer exercises the judgment whether to use deadly force (Maj. op. at 458–59). An expansive view of the totality of the circumstances, they claim, would allow the jury to exercise inappropriate hindsight in

---

7. I agree with the majority opinion (at 458, n. 5) that we should not dispose of this latter contention by construing a statement made by Petitioner's counsel at oral argument before us as a concession of abandonment of the issue.

8. This reading of *Graham* largely formulated Respondent's argument that the police guidelines in this case are per se inadmissible. I shall discuss this *infra*.

considering whether the police officer reasonably used deadly force. *Id.*

B.

"This Court has recognized that a common law action for damages lies when an individual is deprived of his or her liberty in violation of the Maryland Constitution." *Okwa v. Harper,* 360 Md. 161, 201, 757 A.2d 118, 140 (2000) (citing *DiPino v. Davis,* 354 Md. 18, 50, 729 A.2d 354, 371 (1999); *Ashton v. Brown,* 339 Md. 70, 101, 660 A.2d 447, 462 (1995); *Widgeon v. Eastern Shore Hosp. Center,* 300 Md. 520, 537–38, 479 A.2d 921, 930 (1984)). In interpreting the Constitution of Maryland, we may look to the federal courts and their interpretation of the United States Constitution's analogous companion provisions, if any. *Id.* Here, Article 26 of the Maryland Declaration of Rights is at issue. It states:

Article 26. Warrants.

That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are [grievous] and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted.

Its federal counterpart is the Fourth Amendment which states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

In *Cartnail v. State,* 359 Md. 272, 283, 753 A.2d 519, 525 (2000), we noted:

It has long been said that "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others,

unless by clear and unquestionable authority of law." "To this end, its main import is the protection against invasions of the sanctity of one's person, home, and the privacies of life."

(Citations omitted). Despite this privacy interest, we noted in *Okwa* that the Supreme Court recognizes "the right of police officers to take necessary measures and use some degree of force when arresting" a suspect. 360 Md. at 199, 757 A.2d at 139. *See Graham*, 490 U.S. at 396, 109 S.Ct. at 1871–72, 104 L.Ed.2d at 455 (citing *Terry v. Ohio*, 392 U.S. 1, 22–27, 88 S.Ct. 1868, 1880–83, 20 L.Ed.2d 889, 906–09 (1968)). That necessary privilege, however, has limitations. The use of force to detain an individual, including "the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1, 7 (1985). "[W]hether the application of deadly force is for the purpose of effectuating an arrest or other stop, or for the purpose of self-defense, it is an acquisition of physical control by a law enforcement official that implicates the victim's [F]ourth [A]mendment interest to be free from unreasonable seizures." *Reed v. Hoy*, 909 F.2d 324, 329 (9th Cir.1989).

In constructing the judicial limitations on the exercise of police force, Supreme Court jurisprudence has sought to balance an individual's fundamental interest in his or her right to be free from government intrusion against the government's need to enforce the law. *See* 3 Wayne R. LaFave, Search and Seizure § 5.1(d), at 32 (3d ed.1996). In *Garner*, the Supreme Court explained:

> To determine the constitutionality of a seizure "[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." We have described "the balancing of competing interests" as "the key principle of the Fourth Amendment." Because one of the factors is the extent of the intrusion, it is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out.

471 U.S. at 8, 105 S.Ct. at 1699, 85 L.Ed.2d. at 7–8 (citations omitted). In the end, the real question is "whether the totality of the circumstances justified a particular sort of search or seizure." *Garner,* 471 U.S. at 8–9, 105 S.Ct. at 1700, 85 L.Ed.2d at 8. *See also Graham,* 490 U.S. at 396, 109 S.Ct. at 1872, 104 L.Ed.2d at 455. This balancing test underlies other Fourth Amendment violation determinations and is recognized by this Court. *See Cartnail,* 359 Md. at 286, 753 A.2d at 527.

In *Graham,* the Supreme Court expressly rejected a rigid formulation in defining the Fourth Amendment standard of reasonableness. The Court recognized that "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application[.]" *Graham,* 490 U.S. at 396, 109 S.Ct. at 1872, 104 L.Ed.2d at 455 (citing *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447, 481 (1979)). Because the reasonableness standard is fluid, "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396, 109 S.Ct. at 1872, 104 L.Ed.2d at 455. *See also Sharrar v. Felsing,* 128 F.3d 810, 822 (3rd Cir.1997) (recognizing several factors including "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time"); *Crosby v. Paulk,* 187 F.3d 1339, 1351 (11th Cir.1999) (quoting *Sharrar*).

Furthermore, the *Graham* Court explained that:

[t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested,

nor by the mistaken execution of a valid search warrant on the wrong premises[.] With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

490 U.S. at 396–97, 109 S.Ct. at 1872, 104 L.Ed.2d at 455–56 (citations omitted). *See also Okwa,* 360 Md. at 200, 757 A.2d at 139. Because "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer['s] actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham,* 490 U.S. at 397, 109 S.Ct. at 1872, 104 L.Ed.2d at 456.

### C.

The issue of establishing a "time frame" on the events that may be considered under *Graham's* totality of the circumstances test seems to me to have split fundamentally the federal circuits, this Court majority's rationalization notwithstanding ("the disagreement may be more the product of context and factual predicate than doctrinal split"—Maj. op. at 453). Several U.S. courts of appeal have determined that pre-seizure events leading up to the use of deadly force are irrelevant to the determination of whether the force was reasonable under the Fourth Amendment. In *Salim v. Proulx,* 93 F.3d 86 (2d Cir.1996), the Court rejected the plaintiff's contention that the circumstances leading up to the police officer's use of force were relevant to a determination of excessive force. The Court stated:

Plaintiff faults [the Officer] for various violations of police procedure, such as failing to carry a radio or call for backup, and also for failing to disengage when the other children

entered the fray. However, [the officer's] actions leading up to the shooting are irrelevant to the objective reasonableness of his conduct at the moment he decided to employ deadly force. The reasonableness inquiry depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force.

*Salim,* 93 F.3d at 92. *See also Elliott v. Leavitt,* 99 F.3d 640, 642 (4th Cir.1996) (court should focus on the circumstances at the moment force is used); *Dickerson v. McClellan,* 101 F.3d 1151, 1162 (6th Cir.1996) (limiting excessive force inquiry "to the moments preceding the shooting"); *Schulz v. Long,* 44 F.3d 643, 648 (8th Cir.1995) (discussing *Cole v. Bone,* 993 F.2d 1328 (8th Cir.1993) and holding that only the seizure itself is scrutinized, not pre-seizure events); *Bella v. Chamberlain,* 24 F.3d 1251, 1256 and n. 7 (10th Cir.1994) (courts should only consider events immediately before use of deadly force and the moment force was used and should not consider pre-seizure events). *But see Anderson v. Branen,* 17 F.3d 552, 560 (2d Cir.1994) ("we can envision cases in which a more specific instruction of excessive force might be appropriate or indeed required, [but] a specific instruction for the jury to consider the reasonableness of the force as a moment-by-moment inquiry was not necessary in this case"); *Rowland v. Perry,* 41 F.3d 167, 173 (4th Cir.1994) (in qualified immunity context, determination of excessive force is "to view it in full context, with an eye toward the proportionality of the force in light of all the circumstances").

These decisions are premised substantially on the *Graham* Court's recognition that, in determining reasonableness, a degree of deference must be accorded to the situation a police officer may be in when he or she makes a split-second decision to use deadly force. *See Graham,* 490 U.S. at 396–97, 109 S.Ct. at 1872, 104 L.Ed.2d at 455–56. *See e.g., Greenidge v. Ruffin,* 927 F.2d 789, 792 (4th Cir.1991), discussed further *infra.* To allow the jury to consider other circumstances, *i.e.,* pre-seizure events, allows the jury to engage in perfect hindsight analysis of what the police officer could have done,

rather than whether what he or she did was reasonable under the immediate ambient conditions. This type of hindsight analysis, these circuits reason, is forbidden by the objective reasonableness standard required by *Graham*. Although accepting that 20/20 hindsight is irrelevant to the *Graham* analysis, other federal circuits nonetheless have refused to confine the excessive force determination to a specific point in time or time period.

In *Deering v. Reich*, 183 F.3d 645 (7th Cir.1999), Reinhold Deering was fatally shot by deputy sheriff James Reich. The facts revealed that a warrant was issued for the arrest of Deering for failing to appear at a hearing on an earlier charge of misdemeanor property damage. Three deputy sheriffs went to Deering's home on his farm to arrest him at 12:45 a.m. They parked their police cruisers out of sight. On foot, they approached the home stealthfully and looked through the window of Deering's bedroom where he was asleep. Deering got up and went to the back door to inquire who was there. The officers apparently identified themselves. Deering retrieved his shotgun and the deputies told him to put it down. Events accelerated and Deering moved out of the house and into the yard. Deering apparently shot at one of the officers and Reich shot Deering. Deering's estate sued the deputy sheriff for violation of Deering's Fourth Amendment rights.

One of the principal issues in *Deering* was what role the "pre-seizure" moments leading up to the use of deadly force played under the reasonableness standard of the Fourth Amendment. The trial judge, in delivering his instructions to the jury, prohibited the jury from considering virtually all pre-seizure evidence. The *Deering* Court disagreed with the District Court's restrictive interpretation of the totality of the circumstances test in *Graham*. It stated:

> The totality of the circumstances cannot be limited to the precise moment when Deering discharged his weapon. That Deering fired a shot is a very important factor; perhaps the jury could easily conclude that it was the controlling factor, but it is not the only relevant factor, in evaluating the constitutionality of Reich's response, which as

we have noted was to discharge 11 rounds of ammunition in Deering's direction. If Deering's firing a shot were the only factor, we would hardly need a trial. And, in fact, the trial judge did not take this extreme view; testimony was not limited to the shooting alone. Some evidence was admitted about matters that occurred prior to the shooting as part of the "totality of the circumstances," a phrase which, in itself, ordinarily gives law enforcement officers a good deal of discretion. In fact, the phrase is most often used to provide justification for police action; usually the totality of the circumstances encompasses some fact or another which validates a search, a seizure, or such things as the reasonableness of force used to carry out an arrest. It includes information which the officer had at the time of his actions, but not information uncovered later.

*Id.* at 649–50. The *Deering* Court placed the *Graham* reasonableness standard in the context of the Supreme Court's recognition in *Garner* that the Fourth Amendment interests of the individual must be balanced with law enforcement necessity. The *Deering* Court elaborated:

Reasonableness depends on the information the officer possesses prior to and at the immediate time of the shooting; the "knowledge, facts and circumstances known to the officer at the time he exercised his split-second judgment as to whether the use of deadly force was warranted." Reasonableness is evaluated from the officer's perspective at the time, not with 20/20 hindsight. What Deputy Reich knew about Deering and the basis for the warrant would seem to fall within these parameters. After all, we can only assume police do not approach the arrest of a jaywalker and a cop killer in the same fashion.

*Id.* at 650 (citations omitted).

The Court then discussed *Garner* and its balancing consideration:

[T]he Court [in *Garner*] considered the constitutionality of a Tennessee statute which authorized the use of deadly force against an unarmed, nondangerous fleeing suspect. In find-

ing the statute unconstitutional, the Court specifically rejected the idea that the Fourth Amendment has nothing to say about how a seizure is made. Rather, in language which is cited over and over, the Court said that in order to determine the constitutionality of a seizure, one must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." At 8, 105 S.Ct. 1694 quoting *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). In the balancing, "it is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out." 471 U.S. at 8, 105 S.Ct. 1694.

*Id.* at 650–51. The *Deering* Court substantiated this view, by examining *Brower v. County of Inyo*, 884 F.2d 1316, 1318 (9th Cir.1989), and explained:

> ... *Brower* involved a roadblock consisting of an 18–wheeler set up across a 2–lane road out of sight around a curve with the headlights of a police car trained on the approach so as to blind an oncoming driver. Brower, a fleeing suspect, slammed into the roadblock. The primary issue in the case was whether the driver's death constituted a seizure, and the unanimous conclusion was that it did. But the issue remained as to whether the seizure was reasonable. On remand [from the Supreme Court in *Brower v. County of Inyo*, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989)], the Court of Appeals for the Ninth Circuit assumed the high-speed chase which preceded the crash into the roadblock arguably constituted as a matter of law a substantial threat to the officers which would justify the use of deadly force. Nevertheless, the court said,

>> [T]here remains the question whether such force was necessary to prevent the escape. Necessity is the second prerequisite for the use of deadly force under Garner. The necessity inquiry is a factual one: Did a reasonable non-deadly alternative exist for apprehending the suspect?

*Id.* at 651 (citing *Brower*, 884 F.2d at 1318). "Applied to our case [*Deering*], both the time and manner of the execution of the warrant are part of the totality of the circumstances." *Id.* *See also Alexander v. City and County of San Francisco*, 29 F.3d 1355, 1357 (9th Cir.1994).

The *Deering* Court also refused to restrict the totality of the circumstances because in other cases within the same circuit, the underlying crime could sometimes be a factor in determining whether the police acted reasonably in using deadly force. Specific to *Deering*, the Court assessed whether the basis for the warrant, *i.e.*, that it was issued for a misdemeanor, could be considered by the jury. Noting that *Graham* contemplated consideration of the severity of the underlying crime, *Deering* stated:

> *Estate of Starks v. Enyart*, 5 F.3d 230 ( [7th Cir.] 1993), involved both the issue of the underlying crime and the relevance of the police conduct. Considering both issues in the context of an officer's claim of qualified immunity from suit, we said that an officer may use deadly force "only to seize a fleeing felon who has committed a violent crime or who presents an immediate danger to the officer or others." Recognizing that officers may use deadly force to protect themselves "even after choosing a risky course of action," we nevertheless found it relevant to the analysis that the officers knew "that the underlying crime was not accomplished violently." [*Id.* at] 233. Again we pointed out that it is necessary to balance the intrusion with the countervailing governmental interests at stake. In the context of fleeing felons, what that meant to us was the not very revolutionary idea that deadly force is allowed against violent fleeing felons in part because they have forfeited the right to a less intrusive seizure and that fleeing felons who have not resorted to violence have a right to less intrusive seizures. But we continued:
>
> > If a fleeing felon is converted to a "threatening" fleeing felon solely based on the actions of a police officer, the police should not increase the degree of intrusiveness. In other words, we have no countervailing governmental

interest in unreasonable police conduct that would justify a greater intrusion on the individual's rights. [*Id.* at] 234. A further sampling of our cases illustrates our usual view of totality of the circumstances. In *Jaffee v. Redmond,* 51 F.3d 1346 (7th Cir.1995), Officer Mary Lu Redmond responded to a report of a fight at an apartment complex. When she arrived at the scene, Ricky Allen was chasing and poised to stab another man with a butcher knife. Because a person's life was in danger, Redmond fired, killing Allen. A jury awarded Allen's surviving family members $545,000. Although we remanded the case for a new trial on other grounds, we approved an instruction which said that the jury should consider "all the facts and circumstances with which Mary Lu Redmond was confronted." In *Plakas v. Drinski,* [19 F.3d 1143, 1148 (7th Cir.1994)] a deputy sheriff [Drinski] was confronted with a man [Plakas] menacing him with a fireplace poker and threatening him with death. The deputy shot and killed the man. In evaluating the district court's grant of summary judgment, relying on *Tom v. Voida,* 963 F.2d 952 (7th Cir.1992), we said that in determining reasonableness, we "carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage." 19 F.3d at 1150.

*Deering,* 183 F.3d at 651–52. *See also Menuel v. City of Atlanta,* 25 F.3d 990 (11th Cir.1994) (citing *Plakas* with approval).

The *Deering* Court summarized Seventh Circuit precedent as follows:

These cases—and others too numerous to relate—mean that what Deputy Reich knew at the time-about Deering, his crime, and the warrant, and his perception of the danger he and the other deputies were in—was relevant to the evaluation of the reasonableness of his conduct. In addition, the balancing required by *Garner* requires a look at the countervailing governmental interest in serving the warrant on Deering, which would include the time and manner in which it was served. Finally, of course, all of the events that occurred around the time of the shooting are relevant. In

other words, the totality of the circumstances is what must be evaluated. When a case is tried to a jury, the evaluation of those circumstances must be left to that jury.

*Id.* at 652.

In *St. Hilaire v. City of Laconia*, 71 F.3d 20, 26 (1st Cir.1995), the Court expressly rejected setting a time frame on the totality of the circumstances test, stating:

We ... reject defendants' analysis that the police officers' actions need be examined for "reasonableness" under the Fourth Amendment only at the moment of the shooting. We believe that view is inconsistent with Supreme Court decisions and with the law of this Circuit. The Supreme Court in *Brower v. Inyo*, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), held that once it has been established that a seizure has occurred, the court should examine the actions of the government officials leading up to the seizure. The Court held that petitioners' decedent was "seized" when he crashed into a police roadblock set up in order to stop his flight. "We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Id.* at 599, 109 S.Ct. at 1382. The Court remanded the cause for a determination of whether the seizure was "unreasonable" in light of petitioners' allegations that the roadblock had been set up in such a manner as to be likely to kill the decedent. *Id.* ...

In *Abraham v. Raso*, 183 F.3d 279 (3rd Cir.1999), the Court of Appeals for the Third Circuit reversed the granting of summary judgment to a police officer on the issue of excessive force. In *Abraham*, the estate of Robert Abraham sued police officer Kimberly Raso after she shot and killed Abraham in a mall parking lot as he tried to escape after being caught shoplifting from a Macy's department store. Raso claimed that she shot Abraham only after he tried to hit her with his car as she tried to block his path. The estate claimed that Abraham was shot from the side, not the front of the car, demonstrating that the police officer's life was not in danger. The claim was that excessive force was used to capture

Abraham for evading arrest. The District Court granted summary judgment in favor of Raso because the trial judge determined that Abraham was a threat to the public and it was reasonable for Raso to use deadly force to apprehend him.

The *Abraham* Court explained that *Graham* required consideration of whether the suspect was a threat to the officer or public. *See* 183 F.3d at 289. To determine whether Abraham was a threat to the officer or the public required analysis of the events leading up to the shooting. The Court rejected the reasoning of its sister jurisdictions that have excluded pre-seizure events leading up to the use of deadly force:

> [W]e want to express our disagreement with those courts which have held that analysis of "reasonableness" under the Fourth Amendment requires excluding any evidence of events preceding the actual "seizure." *See, e.g., Cole v. Bone,* 993 F.2d 1328, 1333 (8th Cir.1993) ("we scrutinize only the seizure itself, not the events leading to the seizure"); *Carter v. Buscher,* 973 F.2d 1328, 1332 (7th Cir.1992) [9] ("pre-seizure conduct is not subject to Fourth Amendment scrutiny."); *Bella v. Chamberlain,* 24 F.3d 1251, 1256 (10th Cir.1994) (quoting *Bone* and *Carter*). The District Court alluded to similar cases confining the reasonableness inquiry to the moment the officer used force.

Based on these cases, we apparently should not consider any of the circumstances before the moment Abraham was actually struck by Raso's bullet because, following *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), a suspect is not seized until he submits to the

---

**9.** The *Deering* Court may have subsequently clarified the holding of *Carter. See* 183 F.3d at 650. *Deering* explains:

In *Carter,* . . ., we indicated that the proper inquiry is whether the force used was reasonable in the totality of the circumstances, not "whether it was reasonable for the police to create the circumstances." At 1331. Reading *Carter* in the context of other cases, however, we think the most that can be said, for purposes of our case, is that *Carter* reinforces the concept, which we will discuss later, that the deputies did not need to consider all feasible alternatives in serving the warrant on Deering. But that is not the same as saying that any specific alternative is per se reasonable.

police's show of authority or the police subject him to some degree of physical force. *Bone, Carter,* and *Bella* might be understood as only excluding evidence that helps the plaintiff show the force was excessive, so on this more narrow reading, we could consider Abraham's pre-seizure conduct if it undermines the estate's case. But even apart from the problematic justification for such a distinction, there are considerable practical problems with trying to wrest from a complex series of events all and only the evidence that hurts the plaintiff. (What do we say about Abraham's inching forward before he began accelerating? Assuming the inching occurred, does it help him by showing he really did not want to hit Raso and was just wondering whether she would shoot when he drove past her, or does it show that he weighed his options and decided he would hit her? If the evidence can only be considered on the latter interpretation, should a limiting instruction be available upon request?) In any event, since the cases purport to exclude all pre-seizure conduct and do not expressly draw any distinction between who the evidence helps, our discussion will assume the rule applies generally to all pre-seizure conduct.

We reject the reasoning of *Bone, Carter,* and *Bella* because we do not see how these cases can reconcile the Supreme Court's rule requiring examination of the "totality of the circumstances" with a rigid rule that excludes all context and causes prior to the moment the seizure is finally accomplished. "Totality" is an encompassing word. It implies that reasonableness should be sensitive to all of the factors bearing on the officer's use of force.

*Abraham,* 183 F.3d at 291. The *Abraham* Court was particularly critical of such a time restriction because it is impractical in application:

A more fundamental point is that it is far from clear what circumstances, if any, are left to be considered when events leading up to the shooting are excluded. How is the reasonableness of a bullet striking someone to be assessed if not by examining preceding events? Do you include what Raso saw when she squeezed the trigger? Under at least

some interpretations of *Hodari,* Abraham evidently was not seized until after the bullet left the barrel and actually struck him. *See Hodari D.,* 499 U.S. at 630, 111 S.Ct. at 1552 (dissenting opinion) (suggesting that under the majority's analysis, there may be no seizure when the police shoot and miss). If we accept both this interpretation of *Hodari* as well as the rule that pre-seizure conduct is irrelevant, then virtually every shooting would appear unjustified, for we would be unable to supply any rationale for the officer's conduct.

Courts that disregard pre-seizure conduct no doubt think they could avoid this problem. But even rejecting the rigorous interpretation of *Hodari,* courts are left without any principled way of explaining when "pre-seizure" events start and, consequently, will not have any defensible justification for why conduct prior to that chosen moment should be excluded.

The Supreme Court has allowed events prior to a seizure to be considered in analyzing the reasonableness of the seizure. In *Brower,* the Court remanded for a determination of whether the police acted reasonably in constructing a roadblock used to seize a suspect in a car chase. The suspect's estate alleged that the police designed the roadblock in a way likely to kill by placing a tractor trailer behind a curve and directing car headlights to blind the suspect as he rounded the curve. *Brower,* 489 U.S. at 599, 109 S.Ct. at 1383. Under the analysis encouraged in *Bone, Carter,* and *Bella,* preparations predating the moment of seizure, i.e., the moment the car actually collided with the tractor trailer, must be barred from consideration. But if preceding conduct could not be considered, remand in *Brower* would have been pointless, for the only basis for saying the seizure was unreasonable was the police's pre-seizure planning and conduct. *Hodari* itself cited *Brower* but did not suggest the Supreme Court was now rejecting *Brower's* implication that pre-seizure conduct is relevant to the reasonableness of a seizure.

We agree with the First Circuit which concluded that *Bone, Carter,* and other courts following their rule are

mistaken and misread *Hodari* when they suggest the case supports their rule. As the First Circuit explained:

> [T]he question in [*Hodari*] was not whether the seizure was reasonable, which requires an examination of the totality of the circumstances, but whether there had been a seizure at all. We do not read this case as forbidding courts from examining circumstances leading up to a seizure, once it is established that there has been a seizure. We understand *Hodari* to hold that the Fourth Amendment does not come into play unless there has been a seizure ...

*St. Hilaire,* [71 F.3d at 26, n. 4]. In sum, we think all of the events transpiring during the officers' pursuit of Abraham can be considered in evaluating the reasonableness of Raso's shooting. *Cf. Rowland v. Perry,* 41 F.3d 167, 173 (4th Cir.1994) ( "The better way to assess the objective reasonableness of force is to view it in full context, with an eye toward the proportionality of the force in light of all the circumstances. Artificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness.").

*Id.* at 291–92.

The *Abraham* Court did recognize that not all pre-seizure events or facts are equally relevant or important and some may be so attenuated that they have no connection to a police officer's use of force. *See* 183 F.3d at 292. "But what makes these prior events of no consequence are ordinary ideas of causation, not doctrine about when the seizure occurred." *Id.*

In *Jackson v. Sauls,* 206 F.3d 1156, 1170 (11th Cir.2000), the Court also rejected a bright line rule:

> this Court has concluded that "Fourth Amendment jurisprudence has staked no bright line for identifying forces as excessive," that "[t]he hazy border between permissible and forbidden force is marked by a multifactored, case-by-case balancing test," and "[t]he test requires weighing of all the circumstances." *Smith v. Mattox,* 127 F.3d 1416, 1419 (11th Cir.1997).

Despite the split within the federal circuits, the federal courts of appeal universally accord deference to the nature of situations when a police officer is called upon to determine whether deadly force should be used and, therefore, prohibit $^{20}/_{20}$ hindsight inquiry of those situations. In *Roy v. Inhabitants of the City of Lewiston*, 42 F.3d 691 (1st Cir.1994), the Court affirmed the District Court's grant of summary judgment to a defendant police officer in the context of a § 1983 claim of excessive force. The facts were undisputed. Two police officers, including an officer Whalen, answered a domestic violence call at the home of Michael Roy. Roy's wife told the police when they arrived that Roy had two knifes and that he told her he would use them on the police officers if they approached him. The police officers went to the backyard where they found Roy lying on the ground. Roy, who was drunk, became angry when he learned from the officers on the scene that another officer was on his way to serve Roy with a summons based on a complaint filed by another woman whom he allegedly struck earlier the same day. The third police officer arrived and read Roy his *Miranda* rights. Roy refused to accept the summons so the police officer pushed it into Roy's pocket. Roy got upset went into the house, got two steak knives, and came out of the house flailing his arms, knives in hand. The officers retreated backwards and gave warnings. They made attempts to distract Roy and disarm him. Roy then lunged toward Whalen and his fellow officer. Whalen shot Roy twice.

Roy did not dispute that these events happened. Rather, he claimed that the police officers were not properly trained in alternative methods of using non-deadly force. An expert on police procedure submitted an affidavit stating that the police officers should have used mace, but they did not because the police force does not supply mace to its officers. He went further to say the police officers should have stayed at least 20 feet away from Roy, according to proper procedures, but that they were only a few feet away. In comparing common law negligence to the Fourth Amendment reasonableness standard, the Court of Appeals stated:

the Supreme Court's standard of reasonableness is comparatively generous to the police in cases where potential danger, emergency conditions or other exigent circumstances are present. In [*Graham*], the Court said that the "calculus of reasonableness" must make "allowance" for the need of police officers "to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. at 1871–72. *Cf. Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (negligence not a due process violation).

Also pertinent is the Court's more general statement in *Anderson v. Creighton* addressed to qualified immunity for a Fourth Amendment violation. The Court used as its standard the "reasonable officer" and what "could reasonably have been thought lawful" by such an officer, 483 U.S. at 638, 107 S.Ct. at 3038, terms suggesting a measure of deference. The Court then quoted earlier decisions saying that immunity protects "all but the plainly incompetent or those who knowingly violate the law" or those who act where "the law clearly proscribed the actions" taken. *Id.* at 638–39, 107 S.Ct. at 3038. *See also Malley v. Briggs*, 475 U.S. 335, 343, 106 S.Ct. 1092, 1097, 89 L.Ed.2d 271 (1986) (qualified immunity leaves "ample room for mistaken judgments").

What these precedents dictate is this: whether substantive liability or qualified immunity is at issue, the Supreme Court intends to surround the police who make these on-the-spot choices in dangerous situations with a fairly wide zone of protection in close cases. Decisions from this circuit and other circuits are consistent with that view. And in close cases, a jury does not automatically get to second-guess these life and death decisions, even though the plaintiff has an expert and a plausible claim that the situation could better have been handled differently.

*Roy,* 42 F.3d at 695.

After this background analysis, the Court held:

we think that the district court properly granted summary judgment on the section 1983 claim in favor of Whalen. Perhaps a jury could rationally have found that Whalen could have done a better job; but in our view a jury could not find that his conduct was so deficient that no reasonable officer could have made the same choice as Whalen—in circumstances that were assuredly "tense, uncertain, and rapidly evolving. . . ." *Graham,* 490 U.S. at 397, 109 S.Ct. at 1872. Put differently, Whalen's actions, even if mistaken, were not unconstitutional.

*Id.* at 695–96. The Court then conceded:

We have labored over this single point—the Supreme Court's objective reasonableness standard—without any hope of articulating a more concrete or precise gloss of the Court's language. What can be said is that the term reasonableness is used in different ways in different contexts; and in this one—the use of deadly force by the police in dangerous situations—the Supreme Court has allowed more latitude than might be customary in a simple tort case involving careless driving. Terms like "plainly incompetent" or concepts like what "a reasonable officer could have believed" are inherently general, but they add nuance and provide a sense of direction.

*Id.* at 696.

The standard set forth by *Roy* has been applied by the other federal courts of appeal. *See Katz v. United States,* 194 F.3d 962, 968–69 (9th Cir.1999) ("To resolve the merits of an excessive force claim, the question is whether a reasonable officer could have believed that the force used was necessary under the circumstances" or in other words "[a]n officer cannot have an objectively reasonable belief that the force used was necessary . . . when no reasonable officer could have believed that the force used was necessary"); *Scott v. District of Columbia,* 101 F.3d 748, 759 (D.C.Cir.1996) ("[T]he proper question for the jury is whether 'the excessiveness of the force is so apparent that no reasonable officer could have believed in the lawfulness of his actions' ") (citations omitted); *Lennon v.*

*Miller,* 66 F.3d 416, 425 (2d Cir.1995) ("no rational jury could have found that the force used was so excessive that no reasonable officer would have made the same choice").

To this end, it has been recognized that alternative strategies the police officer *could have used* before effecting deadly force do not necessarily mean that the strategy chosen was unreasonable. *See Deering,* 183 F.3d at 650 (whether the force was necessary under the totality of the circumstances does not necessarily mean "whether it was reasonable for the police to create the circumstances" or that the police must consider all viable alternatives before engaging in deadly force); *Scott,* 101 F.3d at 759 ("a plaintiff cannot demonstrate excessive force if the mode of arrest is one that a reasonable officer might have applied"); *Hegarty v. Somerset County,* 53 F.3d 1367, 1377 (1st Cir.1995) (courts should not determine which strategy was the most prudent but rather whether the strategy chosen was); *Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir.1994) ("the appropriate inquiry is whether the officers acted reasonably, not whether they had less intrusive alternatives available to them"); *Plakas,* 19 F.3d at 1149 ("The Fourth Amendment does not require officers to use the least intrusive or even less intrusive alternatives in search and seizure cases. The only test is whether what the police officers actually did was reasonable. We do not believe the Fourth Amendment requires the use of the least or even a less deadly alternative so long as the use of deadly force is reasonable") (citations omitted).

I think it impractical to confine the "totality of the circumstances" to a particular period of time. The reality is that the U.S. courts of appeal that have attempted such a confinement, despite taking great pains to assert that the only circumstances that are used to determine reasonableness when deadly force was used is at the moment, or just prior to, the deadly force being applied, nonetheless rely on pre-seizure facts and activities to make their determination as to whether excessive force was used. Without reference to and consideration of pre-seizure events, no context for reasonableness evaluation of the totality of the circumstances can be illustrated. How else

is the jury to understand the setting in which the force was used ultimately? How else is the jury to acquire the facts known to, or which should have been known by, the defendant police officer at the moment the force was used? Those same facts are vital for the jury to determine whether a reasonable police officer in the ambient situation at issue would have used deadly force. Indeed, the shortsightedness of the majority's and Respondent's position is readily apparent in light of the *Deering* Court's recognition that pre-seizure events might very well be needed by a defendant police officer to prove his or her use of deadly force was reasonable under the totality of the circumstances.

Furthermore, a standardized time frame or line of demarcation for considering deadly force reasonableness would be contrary to the spirit of *Graham* in that it would foreclose a myriad of other factors *Graham* contemplates as apt for consideration, *i.e.* assessing the suspect's danger to the public or the officer, the severity of the crime the suspect allegedly committed, and the suspect's actions in his or her attempt to evade arrest. Some of the facts necessary to make these determinations will not arise necessarily at the moment the deadly force is used. Indeed, as noted *supra*, *Graham* recognized that a strict definition for assessing reasonableness under the Fourth Amendment would be an exercise in futility. Rather, the numerous factors considered must be placed on a scale in order to balance the individual's Fourth Amendment rights against law enforcement needs.

In deadly force cases where individuals are killed, they obviously are unavailable to give their account of the circumstances leading up to their "seizure." As such, scrutiny of the facts and pre-seizure events is necessary to reinforce the integrity of the legal process, as well as law enforcement generally, and to ensure that justice is served during trial. *See Scott,* 39 F.3d at 915. This means the presentation of witnesses, physical evidence, medical reports, and other evidence will be needed to assess the credibility of the surviving police officer's account of the facts. *See id.* The courts cannot simply accept the circumstances of the incident as

offered by the defendant survivor. *See id.* The entire purpose of the trial is for the jury to determine the credibility and weight of facts as presented by both sides, and make its determination of whether deadly force was reasonable under the totality of the circumstances.

I would hold, therefore, that the trial judge erred in his supplemental instructions by confining the jury's consideration of the totality of the circumstances to the moment the shot was fired and that such instruction prejudicially impacted fair consideration of Petitioner's claims. There may be circumstances where, regardless of what transpired before the shooting, that a suspect's or individual's actions at the moment just before the shooting would give an officer reason to believe that deadly force was necessary. *See e.g., Fraire v. City of Arlington,* 957 F.2d 1268, 1276 (5th Cir.1992). Indeed, "[t]he Fourth Amendment does not require police officers to wait until a suspect shoots to confirm that a serious threat of harm exists." *Elliott,* 99 F.3d at 643. This determination, however, is made upon consideration of the totality of the relevant circumstances.

### III.

### A.

Petitioner argues that the trial court erroneously granted the motion in limine to exclude the police guidelines because whether the guidelines are probative, and thus relevant, to the counts of gross negligence, battery, and to the violation of his civil rights under Article 26 of the Maryland Declaration of Rights must be assessed individually. Instead, in this case, the trial judge granted the motion in limine as a blanket prohibition to the admission of the guidelines without first making an individual assessment of probity and relevance as to each cause of action.[10] I agree with Petitioner that "analy-

---

10. The trial judge's ruling on the motion in limine became the overruling substantive basis for his evidentiary rulings on the same or related evidence when offered at trial.

sis of the probative value of the excluded evidence for each count is different" and that the trial judge should have assessed whether the guidelines were probative as to each cause of action.

Respondent argued to this Court that the Fourth Circuit has prohibited the introduction of police procedures and guidelines, a position the majority here appears to accept (Maj. op. at 455–56). He argued that, in light of these cases, such guidelines are irrelevant to the jury's assessment of whether deadly force was reasonable or whether the police officer acted in self-defense and that we should hold that such guidelines are inadmissible *per se*. Moreover, as to the gross negligence claim, Respondent asserted that even if the police guidelines were relevant, he is immune from suit under the qualified public official immunity doctrine.

### B.

### Article 26

I would dispose of this sub-issue with relative brevity in light of Part II of this dissent. This Court frequently has considered police procedures and guidelines in determining whether police activity was reasonable under given circumstances. *See e.g., Williams v. Mayor & City Council of Baltimore*, 359 Md. 101, 139–40, 753 A.2d 41, 61–62 (2000); *Albrecht*, 336 Md. at 502–03, 649 A.2d at 349–50; *Boyer v. State*, 323 Md. 558, 591, 594 A.2d 121, 137 (1991).

Indeed, the Supreme Court's holding in *Garner* was based partially on consideration of police procedures. In *Garner*, the Court held that the common law rule enabling officers to use all necessary means, including deadly force, to effect an arrest of a fleeing felon was unconstitutional particularly "when viewed in light of the policies adopted by the police department themselves" which narrowed the circumstances of when deadly force could be used as compared to the common law. *See* 471 U.S. at 18, 105 S.Ct. at 1705, 85 L.Ed.2d at 14.

Federal courts of appeals have determined, in excessive force contexts, that police procedures are admissible in determining whether police actions were reasonable. *See Ludwig v. Anderson,* 54 F.3d 465, 472 (8th Cir.1995) ("Although these 'police department guidelines do not create a constitutional right,' they are relevant to the analysis of constitutionally excessive force") (citations omitted); *Scott,* 39 F.3d at 916 (police procedures are admissible if they are germane to the reasonableness inquiry in an excessive force claim); *Samples v. City of Atlanta,* 916 F.2d 1548, 1551 (11th Cir.1990) (proper for expert to testify to law enforcement standard for exercising deadly force); *Kladis v. Brezek,* 823 F.2d 1014, 1019 (7th Cir.1987) (expert could testify on proper police procedures for disarming suspect in excessive force case); *Peraza v. Delameter,* 722 F.2d 1455, 1456 (9th Cir.1984) (trial judge did not commit error in admitting canine policy in excessive force case).

Neither the majority nor the Respondent has convinced me that Fourth Circuit precedent is settled on the issue of whether police procedures are inadmissible *per se* in excessive force cases. In *Greenidge,* 927 F.2d at 791, 793 the Court of Appeals for the Fourth Circuit held that the District Court did not abuse its discretion in prohibiting the plaintiff from introducing police procedures to show that the defendant police officer's deviance from police procedures may have lead to the use of deadly force. In particular, the police procedures at issue related to night time prostitution arrests. The police officer observed an illegal sex act in progress. With her badge displayed, she opened the car door and identified herself as a police officer. She ordered the two occupants to place their hands in view. Neither complied. The police officer drew her revolver, pointed it into the car, and repeated her instructions. The plaintiff then reached for an object from behind the seat. The object the officer thought was a shotgun turned out later to be a wooden nightstick. The officer fired her gun and shot the plaintiff, causing him permanent injury. The plaintiff alleged that the police officer should have called

for back-up before making the arrest and should have used a flashlight in accordance with police procedures.

In focusing on the *Graham* Court's emphasis on the moment when the police officer makes the split-second judgment to use deadly force, the Court held "we are persuaded that events which occurred before [the officer] opened the car door and identified herself to the passengers are not probative of the reasonableness of [the officer's] decision to fire the shot. Thus, the events are not relevant and are inadmissible." *Greenidge,* 927 F.2d at 792. *See Elliott,* 99 F.3d at 643–44 (approving and applying *Greenidge's* reasoning); *Drewitt v. Pratt,* 999 F.2d 774, 779 (4th Cir.1993).

In *Kopf v. Skyrm,* 993 F.2d 374, 378–80 (4th Cir.1993), however, the Court reversed the District Court's grant of summary judgment in favor of the defendant police officers. In *Kopf,* three police officers chased down a robbery suspect, Anthony Casella. The police officers used various means to subdue Casella, including a slapjack and an attack dog named "Iron." Casella was severely beaten and suffered from multiple dogs bites. He suffered permanent mental disabilities from which he never recovered. He filed suit against the police officers. During the pendency of the case, he was killed in prison while serving the sentence for the robbery conviction. His mother, Ada Kopf, was substituted as plaintiff.

The District Court granted the defendants' motion in limine that two of the plaintiff's expert witnesses would not be permitted to testify as to the standard of how to use a police dog nor on the proper use of slapsticks. The plaintiff was then forced at trial to call one of the defendant police officers to examine him on the use of the dog and the slapstick. Ms. Kopf also introduced police lesson plans which stated that the police should not strike the aggressor's head, neck, or throat. The trial judge permitted the defendant officers to call in their case the author of the lesson plans to testify that the police may be able to hit an aggressor's head if necessary on rare occasions. The plaintiff's experts thereafter were not allowed

to be called to rebut the author's assertions. The jury found in favor of the defendants.

On appeal, the plaintiff argued that her two experts— Thomas Knott, a retired canine unit trainer for the Baltimore City police, and Robert diGrazia, former Montgomery County, Maryland, Chief of Police—would have testified that the modalities of deadly force used by the police officers were excessive in light of accepted police practices on the use of dogs and slapsticks. The Court of Appeals reversed:

The district court held that the excessive force standard— "objective reasonableness"—is comprehensible to a lay juror and that expert testimony would therefore not assist the trier of fact ...

As a general proposition, the "objective reasonableness" standard may be comprehensible to a lay juror. On the other hand, any "objective" test implies the existence of a standard of conduct, and, where the standard is not defined by the generic—a reasonable person—but rather by the specific—a reasonable officer—it is more likely that Rule 702's [of the Federal Rules of Evidence] line between common and specialized knowledge has been crossed.

The district court seems to have deduced a blanket rule that expert testimony is generally inappropriate in excessive force cases from *Wells v. Smith,* 778 F.Supp. 7 (D.Md.1991). To the contrary, expert testimony has often been admitted in such cases. *Davis v. Mason County,* 927 F.2d 1473, 1484–1485 (9th Cir.), *cert. denied,* 502 U.S. 899, 112 S.Ct. 275, 116 L.Ed.2d 227 (1991); *Samples v. City of Atlanta,* 916 F.2d 1548, 1551–1552 (11th Cir.1991[1990]); *Kerr v. City of West Palm Beach,* 875 F.2d 1546, 1551 (11th Cir.1989) (expert testimony concerning expected dog bite ratios in canine units); *Kladis v. Brezek,* 823 F.2d 1014 (7th Cir. 1987). Nonetheless, a blanket rule that expert testimony is generally admissible in excessive force cases would be just as wrong as a blanket rule that it is not.

The facts of every case will determine whether expert testimony would assist the jury. Where force is reduced to

its most primitive form—the bare hands—expert testimony might not be helpful. Add handcuffs, a gun, a slapjack, mace, or some other tool, and the jury may start to ask itself: what is mace? what is an officer's training on using a gun? how much damage can a slapjack do? Answering these questions may often be assisted by expert testimony.

A dog is a more specialized tool than a gun or slapjack. How to train a poodle to sit or roll over is not everyday knowledge and could be explained by an expert in a case where it was relevant. How to train and use a police dog are even more obscure skills. Both Knott and diGrazia were qualified to testify about this specialized knowledge by their long experience.

diGrazia's proffered testimony about the use of slapjacks is a closer issue. A club and the damage it can cause when it strikes a person's head are easily understood by most laymen. Still, diGrazia should clearly have been permitted to testify as to the prevailing standard of conduct for the use of slapjacks, even if he had been precluded from giving an opinion on the ultimate issue of whether the use in this case was reasonable.

The total, in limine exclusion of Knott and diGrazia's testimony was an abuse of discretion.

*Kopf,* 993 F.2d at 378–79.

While I do not assay to reconcile these two cases, I note that both *Greenidge* and *Kopf* dealt with the admissibility of facts that purported to show that police conduct deviated from police training or operating procedures. Whether these facts were to be introduced via witness testimony or documents is not material to the issue of whether police training or procedures are inadmissible *per se* because, as the majority and Respondent claim, they allow the jury to engage in 20/20 hindsight analysis of how a police officer should have acted in the ideal, rather than whether the police officer acted reasonably under the totality of the circumstances. Here, the trial court seemingly granted Respondent's motion in limine based not just on the belief that the guidelines were irrelevant to the

issue of whether the deadly force was necessary at the moment the shot was fired, but also because the trial court was concerned that Petitioner was attempting to show that a deviation from the guidelines was unreasonable *per se.*

In light of Part II of this dissent and that police guidelines are often considered as a factor in determining the reasonableness of police conduct, I conclude that the trial court erred in refusing, at least for the reasons offered, to allow the guidelines to be admitted. The previously highlighted portions of the guidelines Petitioner sought to admit in the case *sub judice* were relevant to and probative of the issue of whether reasonable force was used by Respondent. These procedures are part of a Baltimore City police officer's ongoing training.[11] They aid the Baltimore City police department in molding the "reasonable police officer." The guidelines, like the consideration of pre-seizure events discussed *supra,* may not be restricted neatly to a temporal setting. In combination with other training and experience in the field, they resonate with the police officer when he or she confronts a decision to use deadly force, whether that decision is made ten seconds, three to six seconds (as Respondent estimated the critical period to be here), or a nanosecond before a shot is fired. As such, they also aid lay persons—such as usually populate a jury—in appraising whether a police officer acted reasonably in cases where deadly force is used. Part of that reasonableness, according to the guidelines, is for the police officer to determine, under the situation he or she faces, when to use deadly force.

A more restrictive approach would be unwise. While deviance from police procedures can be used as evidence to show that the police officer may have acted unreasonably, those procedures might also be used to show that he or she acted reasonably. This well may be the case here, where the

---

11. I note that Respondent explained that part of his conduct regarding assumption of the ready position, with his weapon drawn and aimed at "center mast" of the kitchen closet, as an example of his training at the Police Academy.

guidelines provide the police officers with wide discretion under exigent circumstances.

I share the trial court's concern that Petitioner may have intended to show, through introduction of the guidelines, that a deviation from police procedures demonstrates that the police officer *per se* acted unreasonably. Police procedures are not necessarily the gold standard for determining self-defense, nor is a deviance from police procedures in itself a cause of action in Maryland. The proper method of placing in proper context the consideration by a jury of police guidelines and procedures is by instructing the jury that they are but some of the many factors to be considered and should not alone be deemed dispositive of the question of reasonableness.

I am not unaware of the many dangerous situations police officers confront on a daily basis. The police officer's privilege to use deadly force, however, must be balanced against a citizen's right to be free from unjustified injury or death. One way to balance these interests is for a jury to weigh relevant evidence, fairly presented by both sides. These factors must be balanced and weighed by the jury, not the trial judge. The determination of reasonableness under the circumstances here is an issue for the trier of fact to decide. *See Guerriero v. State*, 213 Md. 545, 549, 132 A.2d 466, 468 (1957); *Baltimore Transit Co. v. Faulkner*, 179 Md. 598, 601, 20 A.2d 485, 487 (1941); *Wilson v. State*, 87 Md.App. 512, 521, 590 A.2d 562, 566 (1991).

## C.

### Battery

Petitioner asserts that the per se exclusion of the police guidelines was error because those guidelines were relevant to the issue of Respondent's assertion of self-defense with regard to his battery claim. He argues:

> In determining whether or not [Respondent's] actions were justifiable self-defense to a battery claim, one cannot look at his actions in a vacuum. One cannot claim he is

acting in self-defense when he creates a danger which necessitates the act which he claims is self-defense.

The Baltimore Police Department Training Bulletin Guidelines on Use of Deadly Force state in pertinent part that "[o]fficers must use deadly force only as a last resort," "[o]fficers should try to avoid putting themselves in a situation where they have no option but to use deadly force," and should "[w]ait for [a] sufficient number of officers to handle [the] situation without undue force."

[Respondent's] claim of self-defense weakens considerably in light of his violation of the Guidelines. Clearly, [Respondent] did not avoid putting himself in a situation where he had no option but to use deadly force and did not wait for a sufficient number of officers to handle the situation without undue force. The call the officers received indicated that they were outnumbered seven to two, and shots had been fired. Entering such a situation in which he was outnumbered greatly increased the likelihood that Officer McGriff would place himself in a situation where he would use deadly force due to a perceived need for self-defense. Accordingly, by his violation of the Guidelines, [Respondent] created the circumstances which compelled him to act in "self-defense." Furthermore, [Respondent's] failure to turn on the lights in an "extremely dark" kitchen also greatly increased the likelihood that he would misperceive what was in the closet and result in [Respondent] discharging his weapon in "self-defense." By not turning on the lights in the "extremely dark" kitchen, [Respondent] failed to avoid putting himself in a situation where he had no option but to use deadly force.

Respondent relies on his argument that the guidelines are inadmissible per se under *Graham*.

It is fundamental that a public official has no immunity if he or she commits an intentional tort. *See Ashton v. Brown,* 339 Md. 70, 117, 660 A.2d 447, 470 (1995); *Cox v. Prince George's County,* 296 Md. 162, 169, 460 A.2d 1038, 1041 (1983). Re-

spondent's defense to the tort of battery was that it was justified by self-defense.

In *Jones v. State*, 357 Md. 408, 422, 745 A.2d 396, 403 (2000), this Court noted that the majority of Maryland cases relating to self-defense have occurred in murder contexts. We delineated the elements of perfect self-defense as follows:

(1) the defendant actually believed that he or she was in immediate or imminent danger of bodily harm;

(2) the defendant's belief was reasonable;

(3) the defendant must not have been the aggressor or provoked the conflict; and

(4) the defendant used no more force than was reasonably necessary to defend himself or herself in light of the threatened or actual harm.

*Jones*, 357 Md. at 422, 745 A.2d at 403. *See also State v. Faulkner*, 301 Md. 482, 485–86, 483 A.2d 759, 761 (1984); *Guerriero v. State*, 213 Md. 545, 549, 132 A.2d 466, 467 (1957). This Court has recognized, however, that the doctrine of perfect self-defense also applies to non-murder crimes, such as common law assault, in both criminal and civil contexts. *See Jones*, 357 Md. at 425, 745 A.2d at 405 (perfect self-defense is a defense to common law assault charges); *Baltimore Transit Co.*, 179 Md. at 600, 20 A.2d at 487 ("If an injury was done by a defendant in justifiable self-defense, he can neither be punished criminally nor held responsible for damages in a civil action").

While self-defense contains both subjective and objective elements, it is the objective element of reasonable force that was argued by both parties here. *See Burch v. State*, 346 Md. 253, 282, 696 A.2d 443, 458 (1997) (discussing *Faulkner*, 301 Md. at 500, 483 A.2d at 768–69 and the subjective and objective elements of self-defense); *Bell v. State*, 114 Md.App. 480, 503, 691 A.2d 233, 244 (1997) (state of mind is an integral element of self-defense). In *Baltimore Transit Co.*, we explained:

One who seeks to justify an assault on the ground that he acted in self-defense must show that he used no more force

than the exigency reasonably demanded. The belief of a defendant in an action for assault that the plaintiff intended to do him bodily harm cannot support a plea of self-defense unless it was such a belief as a person of average prudence would entertain under similar circumstances. The jury should accordingly be instructed that to justify assault and battery in self-defense the circumstances must be such as would have induced a reasonable man of average prudence to make such an assault in order to protect himself.

179 Md. at 601, 20 A.2d at 487. *See also Jones,* 357 Md. at 425, 745 A.2d at 405 ("when an individual reacts, in an honest and reasonable belief, to a threat of imminent danger that may cause his or her death or serious bodily harm and uses no more force than the situation requires, that individual is legally exonerated from the criminal liability his or her actions may create . . . .").

Harper, James, and Gray have noted that in assessing reasonableness, the trier of fact must keep several factors in mind:

"The reasonable character of the means which the actor uses is determined by what a reasonable man, under the circumstances which the actor knows or has reason to know to exist at the time, would regard as permissible in view of the danger threatening him. In determining this, account must be taken of the fact that the other's conduct has put the actor in a position in which he must make a rapid decision. The test is what a reasonable man in such an emergency would believe permissible and not that which, after the event and when the emergency is past, a reasonable man would so recognize as having been sufficient."

Fowler V. Harper, et al., The Law of Torts § 3.11, at 314 (2d 1986) (citing Restatement (Second) of Torts § 63, Comment *j,* (1965)).

In cases alleging lack of reasonableness by a police officer, the objective analysis must be determined in light of the reasonable police officer, rather than the average reasonable layman. In *Albrecht,* we reasoned:

Under almost all circumstances, the gratuitous pointing of a deadly weapon at one civilian by another civilian would almost certainly be negligence *per se*, if not gross negligence *per se*. A police officer, on the other hand, is authorized and, indeed, frequently obligated to threaten deadly force on a regular basis. The standard of conduct demanded of a police officer on duty, therefore, is the standard of a reasonable police officer similarly situated.

336 Md. at 501, 649 A.2d at 349 (citing *Albrecht v. State*, 97 Md.App. 630, 642, 632 A.2d 163, 169 (1993)). In *Wilson v. State*, 87 Md.App. 512, 521, 590 A.2d 562, 566 (1991), the Court of Special Appeals elaborated on the use of reasonable force when police make an arrest:

What amounts to reasonable force on the part of an officer making an arrest usually depends on the facts in the particular case, and hence the question is for the jury. The reasonableness of the force used must be judged in the light of the circumstances as they appeared to the officer at the time he acted, and the measure is generally considered to be that which an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary under the circumstances.

With this heightened standard in mind, I cannot, without sacrificing intellectual honesty, deny that the Fourth Amendment reasonableness standard is similar to the reasonableness standard under the self-defense doctrine as it applies to conduct by police officers. I decline, however, to equate the two doctrines. Unlike the purely objective standard required by *Graham*, the self-defense doctrine contains both subjective and objective elements. Subjectiveness has been excluded by the Supreme Court from excessive force evaluation under the Fourth Amendment. Furthermore, the federal standards under Fourth Amendment analysis may evolve in ways that might not comport with Maryland's evolution of the law of self-defense. While I decline to equate the two standards, however, I do not restrict myself from looking to federal

constitutional reasonable standards where it makes sense to do so.[12]

Some of the concepts in *Graham*, for example, resonate in our cases that discuss police officer civil liability. In *Boyer*, this Court explained, albeit in an emergency vehicle pursuit context, that, despite the fact that police officers may owe a duty of care to innocent third party individuals when chasing a suspect, the nature of a police officer's dangerous daily activity mandated some deference to the officer's conduct in an emergency situation. *See* 323 Md. at 589, 594 A.2d at 136. We opined:

It must be remembered that the police officer's conduct should be judged not by hindsight but should be viewed in light of how a reasonably prudent police officer would respond faced with the same difficult emergency situation. The officer is not to be held to the same coolness and accuracy of judgment of one not involved in an emergency vehicle pursuit. Any officer, confronted with the situation where an individual who poses a threat to others refuses to

---

**12.** I note additionally that the purpose of allowing a civil suit based on tort allegations, as compared to violations of one's civil rights, differs. In *Ashton*, 339 Md. at 105, 660 A.2d at 464, we explained the distinction and why public official immunity is accorded under some tort claims, but not for violations of the Constitution of Maryland:

The purpose of a negligence or other ordinary tort action is not specifically to protect individuals against government officials or to restrain government officials. The purpose of these actions is to protect one individual against another individual, to give one person a remedy when he is wrongfully injured by another person. Issues of governmental immunity in this context concern whether, and to what extent, as a policy matter, a governmental official or entity is to be treated like an ordinary private party.

On the other hand, constitutional provisions like Articles 24 or 26 of the Maryland Declaration of Rights, or Article III, § 40, of the Maryland Constitution, are specifically designed to protect citizens against certain types of unlawful acts by government officials. To accord immunity to the responsible government officials, and leave an individual remediless when his constitutional rights are violated, would be inconsistent with the purpose of the constitutional provisions. It would also . . . largely render nugatory the cause of action for violation of constitutional rights recognized in [Maryland].

(citing *Clea*, 312 Md. at 684–85, 541 A.2d at 1314) (other citations and internal quotations omitted).

stop, and instead attempts to flee at a high rate of speed, must make a split-second decision as how to respond. Risks are attendant upon the officer's decision to pursue and on his decision not to pursue. A high-speed chase may aggravate an already dangerous situation by causing a driver who appears to be operating his vehicle dangerously to do so at higher speeds. On the other hand, if the officer does not pursue an individual believed to be dangerous on the road, such as an intoxicated driver, that individual may nonetheless continue on a dangerous course of conduct and seriously injure someone.

*Boyer*, 323 Md. at 589–90, 594 A.2d at 136–37 (citations omitted).

We recognized, in vehicular chase situations, a police officer "must take into account a number of factors, such as road conditions, vehicular traffic, pedestrian traffic, time of day, weather, dangerousness of the person fleeing, and make what is virtually an instantaneous judgment." *Boyer*, 323 Md. at 590, 594 A.2d at 137. We then cited to numerous sister jurisdictions for the proposition that a "police officer deciding to maintain pursuit may not be negligent even if the course of action he chooses leads to serious injury to an innocent third person." *Boyer*, 323 Md. at 590, 594 A.2d at 137 (citing *"Lee v. City of Omaha*, 209 Neb. 345, 307 N.W.2d 800, 804 (1981) (in affirming the trial court's finding that officers engaged in a high-speed pursuit resulting in injuries to innocent third parties were not negligent, the Supreme Court of Nebraska stated that '[i]t must be remembered that foresight, not hindsight, is the standard by which negligence is determined, and that even an action which in retrospect turns out to have been ill-advised may still have been reasonable under all the circumstances'); *Simmen v. State*, 81 A.D.2d 398, 400, 442 N.Y.S.2d 216 (N.Y.App.Div.1981), *affirmed*, 55 N.Y.2d 924, 449 N.Y.S.2d 173, 434 N.E.2d 242 (1982) ('the actions of the police officer are to be considered as of the time and under the circumstances in which they occurred, not by subsequent facts or in retrospect'); *DeWald v. State*, 719 P.2d 643, 652 (Wyo. 1986) ('we will not unfairly use hindsight in assessing official

actions challenged in litigation'). *See West v. United States,* 617 F.Supp. 1015, 1017–1018 (C.D.Cal.1985), *affirmed,* 807 F.2d 178 (9th Cir.1986) (in light of the circumstances under which the officers were operating, they were not negligent in conducting a high-speed pursuit of suspected law violators); *Bailey v. L.W. Edison Charitable Foundation,* 152 Ind.App. 460, 284 N.E.2d 141, 145 (1972) ('Thus, the protection of life and property by capturing a fleeing offender who, by not stopping his vehicle, wantonly and wilfully endangers public safety must be weighed against the possibility of endangering life and property by commencing or continuing the pursuit')").

I glean from *Boyer* that this Court adheres to the principle that the actions of a police officer are not to be determined unreasonable through hindsight or in retrospect, but rather that they must be evaluated taking into consideration the circumstances under which it occurred and the facts known to, or which should have been known by, the police officer when he or she acted. *See Boyer,* 323 Md. at 590, 594 A.2d at 137. Furthermore, there are no hard rules in evaluating the reasonableness of police conduct and "each case depends upon its own facts." *Boyer,* 323 Md. at 591, 594 A.2d at 137.

I would hold that the trial court erred, as a threshold matter, in refusing for the reasons given to consider admission of at least the portions of the guidelines highlighted in this dissent with regard to Petitioner's battery claim vis à vis Respondent's assertion of self-defense. As I explained, *supra,* portions of the guidelines may be relevant to, although not dispositive of, the determination of whether a reasonable police officer would have used deadly force in self-defense under the totality of the circumstances.

### D.

### Gross Negligence

Petitioner argues that the guidelines were relevant to the gross negligence claim in that they tend to prove that Respondent's actions amounted to a wanton and reckless disregard for the rights of others. Petitioner states:

Not only did [Respondent] violate the Guidelines, the information contained in the Guidelines is what all officers are taught at the police academy. Simply, [Respondent] knew about the Guidelines, but consciously failed to follow them. The violation of the Guidelines certainly could be considered evidence of a wanton or reckless disregard for the rights of others.

Respondent counters that we need not resolve whether the guidelines are admissible because the gross negligence claim against Respondent is barred by public official immunity. Respondent cites to cases addressing both statutory and common law public official immunity and argues that he is immune from suit on the gross negligence count. The Court majority, because of its holding as to the inadmissibility of the guidelines, does not reach Respondent's immunity argument. I would reach it and agree with Respondent.

This Court has repeatedly explained that Maryland public officials—both at common law and under certain statutes—are entitled to qualified immunity from tort liability for conduct that may have been negligent in the performance of his or her job duties. *See Parker v. State,* 337 Md. 271, 285, 653 A.2d 436, 443 (1995); *Ashburn v. Anne Arundel County,* 306 Md. 617, 621, 510 A.2d 1078, 1080 (1986); *James v. Prince George's County,* 288 Md. 315, 336, 418 A.2d 1173, 1184 (1980). Under common law, a police officer is considered a public official encompassed by this tort immunity if he or she acts within the scope of law enforcement functions. *See Clea v. Mayor and City Council of Baltimore,* 312 Md. 662, 672, 541 A.2d 1303, 1308 (1988); *Bradshaw v. Prince George's County,* 284 Md. 294, 302–03, 396 A.2d 255, 260–61 (1979), *overruled in part on other grounds, James,* 288 Md. at 336, 418 A.2d at 1184. We have determined that police officers act on behalf of the State of Maryland and thereby exercise sovereign police power in the course of their duties. *See James,* 288 Md. at 336, 418 A.2d at 1184; *Harris v. City of Baltimore,* 151 Md. 11, 133 A. 888, 892 (1926). Because the exercise of discretionary force is inherent in the everyday duties of a police officer, we have long recognized that police officers are not subject to tradi-

tional tort liability and should remain immune civilly, under such circumstances, from scrutiny by judge or jury as to the wisdom of their actions. *See Parker*, 337 Md. at 285, 653 A.2d at 443. We have explained further that:

> The term "discretion" denotes freedom to act according to one's judgment in the absence of a hard and fast rule. When applied to public officials, "discretion" is the power conferred upon them by law to act officially under certain circumstances according to the dictates of their own judgment and conscience, and uncontrolled by the judgment or conscience of others.

*Ashburn*, 306 Md. at 623, 510 A.2d at 1081.

Qualified immunity from certain tort liability for police officers is necessary from both a practical perspective as well as sound public policy. In *Williams v. Prince George's County*, 112 Md.App. 526, 543, 685 A.2d 884, 893 (1996), the Court of Special Appeals aptly explained:

> When police officers perform discretionary functions, the rationale in insulating officers against all but flagrant abuses of their position, is the necessity to permit police officers, especially in the context of police work, to make the appropriate decisions in an atmosphere of great uncertainty. The theory is that holding police officers liable in hindsight for every injurious consequence of their actions would paralyze the functions of law enforcement. Moreover, permitting unwarranted lawsuits against officers would entail substantial social costs including inhibition and fear of potential liability among peace officers and would further consume much of the officer's time preventing him or her from performing his or her duties. Because of these considerations, immunity is granted to officers who act reasonably, albeit mistakenly, in light of clearly established law and the information they possessed without the benefit of hindsight.

(citations omitted).

As its name suggests, however, qualified tort immunity has its limitations. In *James*, we identified a three prong test for determining whether immunity attaches:

Before a governmental representative in this State is relieved of liability for his negligent acts, it must be determined that the following independent factors simultaneously exist: (1) the individual actor, whose alleged negligent conduct is at issue, is a public official rather than a mere government employee or agent; and (2) his tortious conduct occurred while he was performing discretionary, as opposed to ministerial, acts in furtherance of his official duties. Once it is established that the individual is a public official and the tort was committed while performing a duty which involves the exercise of discretion, a qualified immunity attaches; namely, in the absence of malice, the individual involved is free from liability. The rationale underlying this grant of immunity is that a public purpose is served by protecting officials when they act in an exercise of their discretion.

288 Md. at 323–24, 418 A.2d at 1178 (citations and internal quotations omitted). *See also DiPino v. Davis*, 354 Md. 18, 48–49, 729 A.2d 354, 370 (1999); *Ashton*, 339 Md. at 116–17, 660 A.2d at 470. The only way to pierce the shield is by showing that the police officer's negligent conduct was committed with actual malice.

Petitioner's argument suggests that gross negligence, if proven, would lead to Petitioner piercing public official immunity. Under the circumstances of this case, it would not. Public official immunity is a defense to a negligence suit. *See Ashton*, 339 Md. at 118, 660 A.2d at 471 (affirming the trial court's grant of summary judgment in a civil action against police officer for negligence and gross negligence counts in the absence of malice); *Parker*, 337 Md. at 285, 653 A.2d at 443 ("our cases indicate that qualified public official immunity under Maryland law may apply only to negligence actions").

To the extent that Petitioner believes proof of gross negligence can amount to the quality of malice necessary to pierce public official immunity, such a belief is misplaced. It is true that at common law in civil contexts Maryland has recognized at least two forms of malice: actual and implied. For example, implied malice, it has been said, may be shown by proving

grossly negligent conduct. *See Owens–Illinois, Inc. v. Zeno-
bia,* 325 Md. 420, 451–52, 601 A.2d 633, 648 (1992) (discussing
implied malice arising from gross negligence as "constructive
knowledge" which does not supply the "actual knowledge"
requirement for the receipt of punitive damages). Implied
malice, however, differs from the subjective element of actual
malice in tort law. *See Shoemaker v. Smith,* 353 Md. 143, 163,
725 A.2d 549, 559 (1999); *Owens–Illinois, Inc.,* 325 Md. at
461–63, 601 A.2d at 653–54. The term "malice" as used in civil
common law does not denote a tort. It is, instead, a frame of
mind accompanying an act. "The actual malice needed to
defeat official immunity requires an act without legal justifica-
tion or excuse, but with an evil or rancorous motive influenced
by hate, the purpose being to deliberately and wilfully injure
the plaintiff." *Williams,* 359 Md. at 131, n. 16, 753 A.2d at 57
(citing to *Leese v. Baltimore County,* 64 Md.App. 442, 480, 497
A.2d 159, 179 (1985), *overruled on other grounds, Woodruff v.
Trepel,* 125 Md.App. 381, 725 A.2d 612 (1999)). *See also
Shoemaker,* 353 Md. at 163, 725 A.2d at 560 (noting with
approval that the Court of Special Appeals has long applied
the standard of actual malice in the context of common law or
statutory law public official immunity); *Thomas v. City of
Annapolis,* 113 Md.App. 440, 454, 688 A.2d 448, 454–55 (1997).
While actual malice connotes a subjective intent to injure,
reckless, wanton or wilful misconduct is different than inten-
tional wrongdoing for tort law purposes. In *Johnson v.
Mountaire Farms of Delmarva, Inc.,* 305 Md. 246, 253–54, 503
A.2d 708, 712 (1986), we cited to Comment *f* of the Restate-
ment (Second) of Torts, § 500 (1965), and explained:

> While an act to be reckless must be intended by the actor,
> *the actor does not intend to cause the harm which results
> from it.* It is enough that he realizes or, from facts which
> he knows, should realize that there is a strong probability
> that harm may result, even though he hopes or even expects
> that his conduct will prove harmless. However, a strong
> probability is a different thing from the substantial certainty
> without which he cannot be said to intend the harm in which
> his act results. [Emphasis supplied.]

The General Assembly knows how to express itself when it wishes to withdraw public official immunity for acts of gross negligence. For example, a Baltimore City Police Officer would not be entitled to immunity for grossly negligent acts occurring outside the police officer's jurisdiction. Md.Code (1974, 1998 Repl.Vol.), Courts & Judicial Proceedings Article (CJP), § 5–605, states:

§ 5–605. Law enforcement officer acting outside jurisdiction.

(a) *When not civilly liable.*—A law enforcement officer acting outside the officer's jurisdiction but in the State, is not civilly liable, except to the extent that he would be if acting in his own jurisdiction, for any act or omission in preventing or attempting to prevent a crime, or in effectuating an arrest, in order to protect life or property if:

(1) The action is not grossly negligent; and

(2) The action is taken at the scene of the crime or attempted crime.

(b) *Defense by employer.*—A law enforcement officer sued for acting under subsection (a) of this section shall be defended in any civil action by the law enforcement officer's employer as if the incident had occurred in the officer's jurisdiction.

(c) *Benefits.*—A law enforcement officer who is injured in taking action under subsection (a) of this section is entitled to workers' compensation, disability, death benefits, life insurance and all other benefits to the same extent as if the injury had been sustained in the officer's jurisdiction.[13]

Another example of a similar legislative intent is found within the scheme of the Maryland Tort Claims Act. *See* Md.Code (1999 Repl.Vol.), State Government Article, §§ 12–101, et seq. The immunity from tort liability of one who qualifies as "State personnel," as defined in the Act, for his or her tortious act or

---

**13.** CJP § 5–605 is inapplicable on its face to Respondent as he was acting at the time alleged in Petitioner's Complaint within the boundaries of Baltimore.

omission is waived when the act or omission is made with malice or gross negligence. Md.Code (1998 Repl.Vol., 199 Supp.), CJP, § 5–522(b).[14]

That gross negligence has been expressly provided for as a cause of action for civil liability against certain public officials under certain provisions, and not under others, comports with our recognition in *Shoemaker* that "the Legislature conceived of malice as something beyond the merely reckless or wanton conduct that would be embodied within gross negligence." 353 Md. at 164, 725 A.2d at 560. I conclude, therefore, that based on traditional common law requirements of actual malice, that the implied malice derived from gross negligence in tort law does not satisfy the malice requirement necessary to pierce public official immunity under the common law.

Petitioner argues that admission of the police guidelines aids in proving that Respondent acted in a grossly negligent manner. Petitioner mounts no argument that the guidelines would be probative of actual malice. I would hold, therefore, that even if the Circuit Court erred in not admitting the guidelines, such error did not prejudice Petitioner with regard to the gross negligence count.

Although I have no quarrel with the majority's reasoning and disposition of Petitioner's *Batson* issue (Maj. op. at 465–67), I would not reach or decide it under my view of the other issues explained *supra*.

Judge ELDRIDGE has authorized me to indicate that he agrees entirely with this dissenting in part, concurring in part opinion. Chief Judge BELL also agrees with this opinion, save Part III, D (Gross Negligence) and the reference to the majority's resolution of the *Batson* issue, upon which he writes separately.

BELL, Chief Judge, dissenting.

I join most enthusiastically in all but Part D of Judge Harrell's well reasoned and stated opinion and, thus, share his

---

**14.** The parties to the instant suit have not briefed or argued the application of CJP § 5–522(b).

and Judge Eldridge's rejection of the majority's refusal to allow the petitioner to offer evidence of the violation, by the respondent police officer, of police departmental guidelines as evidence bearing on the respondent's civil liability for the injuries to the petitioner that his actions, alleged by the petitioner to have been grossly negligent, caused him to suffer. This separate opinion is prompted by the majority's disposal of the petitioner's *Batson*[1] challenge to the respondent's exercise of his peremptory challenges on a procedural and purely technical ground. The ground of decision not raised, or argued, by either party and was not the basis for the Court of Special Appeals' decision. Moreover, the *Batson* issue was one of the issues on which we granted certiorari; although it was specifically argued in the petitioner's Petition for Certiorari, we did not exclude it from our grant of the petition.

The majority refuses to review the merits of the petitioner's *Batson* challenge because it was made after the jury was sworn, opining,

"The problem is that [the petitioner] waited too long to register his objection. In *Stanley v. State*, 313 Md. 50, 69, 542 A.2d 1267, 1276 (1988), we concluded that '[a] *Batson* objection is timely if the defendant makes it no later than when the last juror has been seated and before the jury has been sworn.'"

361 Md. 437, 466, 762 A.2d 48, 63 (2000).

Maryland Rule 8–131, in pertinent part, provides:

\* \* \* \*

"(b) In Court of Appeals—Additional Limitations.

"(1) *Prior Appellate Decision.* Unless otherwise provided by the order granting the writ of certiorari, in reviewing a decision rendered by the Court of Special Appeals or by a circuit court acting in an appellate capacity, the

---

**1.** *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), is a case that prohibits the exercise of peremptory strikes on a racially motivated basis.

Court of Appeals ordinarily will consider only an issue that has been raised in the petition for certiorari or any cross-petition and that has been preserved for review by the Court of Appeals. Whenever an issue raised in a petition for certiorari or a cross-petition involves, either expressly or implicitly, the assertion that the trial court committed error, the Court of Appeals may consider whether the error was harmless or non-prejudicial even though the matter of harm or prejudice was not raised in the petition or in a cross-petition."

This case came to us from the Court of Special Appeals, which reviewed the judgment of the Circuit Court for Baltimore City. In that court neither party raised the timeliness of the *Batson* ruling and, in any event, the intermediate appellate court decided the issue on the merits. What's more, as already mentioned, the propriety of the trial court's *Batson* ruling was one of the issues presented, and argued, in the petition for certiorari that the petitioner filed. And this Court granted certiorari to review that issue, among others; we very pointedly did not "otherwise provide[ ] by the order granting the writ of certiorari." Clearly, the petitioner is entitled to a decision on the merits of this issue. This is especially so since an outcome favorable to the petitioner will avoid the result the majority reaches on the issues it does decide on the merits, for it would mean that the petitioner gets his new trial anyway.

I do not contend that the *Batson* challenge was timely under our cases. At this stage of the proceedings, that really is not the point. Where this Court grants certiorari on an issue, it is the cert. petition to which we look to determine preservation, not what happened in the trial court, particularly when the appellate court that initially reviewed the issue decided it notwithstanding, and perhaps despite, the procedural default. A procedural default such as that here at issue does not implicate fundamental jurisdiction [2] and, so, is not

---

**2.** Our cases make clear that, because its meaning depends upon the context and circumstances in which it is used, the word "jurisdiction" is equivocal. *Moore v. McAllister*, 216 Md. 497, 507, 141 A.2d 176, 182

raisable at any time, even for the first time in this Court. But, as already mentioned more times than necessary, I suspect, it was this Court that decided to review the very issue that the majority now wants to avoid on this really technical ground.

I would reverse the judgment of the Court of Special Appeals on the *Batson* issue. The latest cases to explicate Maryland law on the subject are *Gilchrist v. State*, 340 Md. 606, 667 A.2d 876 (1995) and *Harley v. State*, 341 Md. 395, 671 A.2d 15 (1996). See also *Purkett v. Elem*, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), discussed by both *Gilchrist* and *Harley*. Neither case was cited, not to mention discussed, by the intermediate appellate court. In fact, the only *Batson* case mentioned was *Stanley v. State*, 313 Md. 50, 542 A.2d 1267 (1988). More important, the court's discussion of the issue provides no basis for any belief that the trial court, or the intermediate appellate court, for that matter, were aware of or appreciated the application of *Purkett* to the facts of the case.[3]

It is clear to me that, whether the reasons offered by the respondent were race neutral or not, the trial court simply did not appreciate its role in the process and certainly did not properly apply the test explicated in *Purkett, see* 514 U.S. at 767–68, 115 S.Ct. at 1770–71, 131 L.Ed.2d at 839, clarified in the context of this State's *Batson* jurisprudence in *Gilchrist, see* 340 Md. at 619–20, 667 A.2d at 885–86 (Chasanow, J. concurring) and applied in *Harley, see* 341 Md. at 402, 671 A.2d at 19.

------

(1958). Indeed, "Juridically, jurisdiction refers to two quite distinct concepts: (i) the power of a court to render a valid decree, and (ii) the propriety of granting the relief sought." *Id.* (citing 1 Pomeroy, Equity Jurisprudence (5th ed.1941), §§ 129–31); *First Federated Commodity Trust Corp. v. Commissioner of Securities for Maryland*, 272 Md. 329, 334, 322 A.2d 539, 543 (1974). *See Maryland Bd. of Nursing v.. Nechay*, 347 Md. 396, 405, 701 A.2d 405, 410 (1997); *Kaouris v. Kaouris*, 324 Md. 687, 708, 598 A.2d 1193, 1203 (1991). The former concept involves jurisdiction in its fundamental sense. *See McAllister*, 216 Md. at 507, 141 A.2d at 182.

**3.** In fairness, it should be noted that the petitioner did not cite the relevant cases argue them, either.